HILLS OF PALOS CONDOMINIUM ASSOCIATION, INC., *et al.*, Plaintiffs-Appellees and Separate Appellants, v. I-DEL, INCORPORATED, Defendant-Appellant and Separate Appellee and Plaintiff (Douglas Momeyer *et al.*, Plaintiffs-Appellees; James Carpenter *et al.*, Plaintiffs; Beigel and Sandler, Ltd., Separate Appellant; Jacob Weglarz *et al.*, Defendants and Separate Appellees; All Weather Insulating and Roofing Company, Inc., *et al.*, Defendants).

First District (6th Division)   No. 1—92—0811

Opinion filed September 30, 1993.—Rehearing denied November 4, 1993.

450

Richard F. Zehnle and Stephen L. Sitley, both of Vedder, Price, Kaufman & Kammholz, and Robert C. Farrar, of Heineke, Burke, Healy & Bodach, both of Chicago, for I-Del, Inc.

Herbert Beigel and Stephen D. Sharp, both of Beigel & Sandler, of Chicago, for appellee Hills of Palos Condominium Association, Inc.

Robert A. Carson, of Gould & Ratner, of Chicago, for appellee Dale E. Spencer.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, the Hills of Palos Condominium Association, Inc. (Association), on behalf of the individual unit owners, and a number of individual unit owners, brought this action against I-Del, Inc., the developer of the Hills of Palos Condominium complex to recover damages for alleged defects in the construction of the condominiums. Count I of the Association's fifth amended complaint was brought on behalf of the unit owners against I-Del for breach of the implied warranty of habitability. Count II was also brought by the Association, on behalf of the unit owners, and by Douglas and Donna Momeyer against I-Del for breach of the express warranty to keep the roof flashing, roof, windows and doors free from water leaks. Count III was brought by unit owner Christopher Blazek against I-Del for allegedly constructing his unit smaller than called for in the plans. Count IV was brought by the Momeyers against I-Del for breach of the implied warranty of habitability arising from water leaks in their unit.

Following a two-week trial, which commenced July 30, 1991, the jury rendered a verdict in favor of the Association on count I in the amount of $1,271,859. On count II, the jury entered a verdict for the Association in the amount of $2,800 and for the Momeyers in the amount of $7,800. On count III, the jury found against Blazek and in favor of I-Del, Inc. (Count IV was subsumed under count I, and accordingly, no verdict was entered on that count.) I-Del appeals, contending that: (1) the trial court erred in barring its expert from testifying to anything other than the cost of repairs to the masonry on building No. 4; (2) the trial court erred in refusing to submit a special interrogatory to the jury; (3) damages under count I were barred by I-Del's disclaimer of the implied warranty of habitability, which was incorporated into the purchase agreement, and by express exclusions from warranty contained in the builder's warranty; (4) the Association failed to demonstrate that I-Del breached the implied warranty of habitability; (5) the trial court erred in allowing the jury to ascertain the appropriate measure of damages; (6) the Association did not prove that the condominiums diminished in value and therefore could not recover damages; (7) the trial court improperly restricted the testimony of its valuation expert; (8) the trial court wrongly refused to instruct the jury as to the Association's failure to produce individual unit owners as witnesses; (9) the trial court improperly permitted the Association to cross-examine Jacob Weglarz regarding I-Del's previously filed complaint against the brick manufacturer and mason, which forced I-

Del to raise the issue of insurance; (10) the trial court erred in refusing to enter a directed verdict against the Momeyers; (11) the trial court erred in refusing to enforce the settlement agreement reached by the parties in the summer of 1990; and (12) the trial court erred in denying its motion for mistrial on the basis of a juror's unauthorized view of the premises during the trial.

In addition, the Association has filed a separate appeal challenging the trial court's dismissal of Jacob Weglarz, president and majority stockholder of I-Del, as a defendant in the fifth amended complaint, as well as its denial of the Association's motion for leave to file a sixth amended complaint.

Counsel for the Association, Stephen Sharp, has also filed a separate appeal challenging the trial court's award of sanctions to I-Del and two third-party defendants after finding that he failed to clearly convey to such defendants that he represented fewer than all the plaintiffs in settlement discussions which took place in July and August of 1990.

The relevant facts are as follows. In 1978, I-Del began the development of the Hills of Palos Condominiums complex located in Palos Hills, Illinois. In April 1982, control of the condominiums passed from I-Del to the Association.

The Hills of Palos condominium complex consisted of four separate buildings containing a total of 60 units. Barbara Sirovatka was the president of the board of managers of the Association from its inception in April 1982 until April 1991. She and her husband moved into their unit in June 1979, when the first of the four buildings was completed. Sirovatka began to complain to I-Del about various construction defects in the fall of 1979. Among other things, Sirovatka complained to I-Del about cracking and crumbling concrete, openings in the walls around piping, defective weather stripping in the hallways, unfinished landscaping and streets, and leaking roofs.

In June 1980, Sirovatka sent I-Del a list of incomplete and unsatisfactory items that had been observed by the unit owners. I-Del made attempts to repair window and roof leaks as it received complaints, but ceased making repairs in April 1982 when it turned the Association over to the unit owners. In preparation for the turnover, the unit owners created an interim board of managers. The board notified I-Del that some of the brick in building No. 4 was deteriorating because of excessive water falling off the roof.

In June or July of 1982, the board met with representatives of I-Del. I-Del informed the board that it was having the bricks tested by a flood-testing company. Sirovatka then informed I-Del that some of

the brick near the ground was beginning to flake and appeared to be absorbing water from the ground. The board also informed I-Del that it was experiencing problems with the concrete, and I-Del informed the board that it was also having the concrete tested. I-Del attributed the problem with the concrete to the Association's excessive use of de-icing salt.

In 1983, the Association hired an engineering firm to examine the buildings and surrounding areas. Subsequently, a report was issued by Peter Milbratz of the engineering firm, indicating the results of the examination.

Sirovatka testified to the myriad repairs that the board authorized over the years, including replacing the brick wing walls on each building and rebricking portions of building No. 4 due to spalling and deterioration of the brick. She testified that the Association was only able to make minor repairs because it did not have the money for more extensive ones. She estimated that the Association had spent $500,000 since 1982 maintaining and making repairs to the property.

On cross-examination, Sirovatka testified that the water seepage through the floor of her unit was the only major problem she had experienced in her unit. She also acknowledged the disclaimer in the purchase agreement she entered into and agreed that it had not been deleted by her attorney upon his review of the agreement. She acknowledged the allegation in the complaint that the fire walls in the attics were not built in compliance with the local building code and agreed that the Association had never been cited in violation of any section of that code.

John Butler was the managing agent of the Association and had been employed in that capacity since 1982. That year, he made an inspection of the property and noticed some minor flaking of the bricks on building No. 4. Butler testified that the Association had made attempts to avoid many of the problems that were now the subject of the present action against I-Del. At one point, the Association installed gutters over entrance ways so that water would not fall directly onto the brick wing walls, which were starting to collapse. In addition, the Association replaced shingles and repaired flashing to avoid leaks in the units.

Butler further stated that the Association replaced some bricks on building No. 4 that were crumbling, replaced deteriorating handrails and bridges, and repaired damage to the interior of units caused by leaks. Butler testified that the cost to repair problems associated with the roofs, walkways and bridges, masonry, balconies, bay windows, handrails and interior repairs totaled $60,071.

On cross-examination, Butler stated that to his knowledge, the Association did not use salt on the driveways or bridges, but then acknowledged his deposition testimony wherein he stated that the Association did at one time use salt on one of the entrances to the complex. He stated that he had no expertise in analyzing defective new construction.

Peter Milbratz testified as the primary expert witness on behalf of the Association. He had been retained to determine the extent of the construction defects at the Hills of Palos condominiums and the cost to repair them. Relying on Milbratz's examination of the complex and breakdown of the costs, the Association sought damages in the amount of $1,558,376 under count I of its complaint to repair the alleged construction defects.

The primary area of contention throughout discovery and the trial was whether the brickwork on building No. 4 needed to be replaced. In this regard, Milbratz testified that in 1983 he undertook an investigation of the cause of the crumbling of certain brick and the extent of the problem by taking five samples of the brick from the walls of the building using a circular saw. He stated that the building was made of "Chicago common brick," which generally has less weather resistance than face brick, but is commonly used in the Chicagoland area. Milbratz listed the grades of brick as severe weather, moderate weather, and negligible. In Milbratz's opinion, severe weather brick should have been used to construct building No. 4.

Milbratz defined a masonry joint as the mortar element between two bricks, and the bond as the attachment of the mortar to the brick or concrete block. Milbratz stated that bond strength is "perhaps the most important single physical property of hardened mortar."

In examining the building, Milbratz observed mortar joints that were cracked, broken and unfilled, and bricks that were spalled, cracked and bowed. He also noticed a large amount of efflorescence, which he stated was indicative of moisture seeping through the brick.

Milbratz stated that he had removed many brick samples from other walls using a circular saw, and observed that they remained bonded by the mortar. In selecting the locations of the samples on building No. 4, Milbratz chose two sites where he expected there to be a problem because of surrounding crumbling brick, two sites which he did not expect to be a problem, and another site which he characterized as the control sample, which he was sure would not be a problem. Milbratz testified that all of the samples fell apart. He concluded that "this [was] absolutely the worst bond situation" he had ever seen. The brick surfaces where the mortar had debonded were smooth

and relatively free of any residual mortar. In Milbratz's view, this indicated that the mortar had never engaged the bricks.

Milbratz opined that defects in the *design* of the masonry on building No. 4 existed because the plans called for the use of face brick, but there was no indication on the plans as to what type of face brick. Nor was there an indication as to the type of mortar to be used. Milbratz criticized the fact that common brick was used in place of face brick on building No. 4. He testified that the use of common brick saved I-Del approximately $10,000, and that the bricks were in fact defective. He based this conclusion on the results of tests which had been performed by a construction testing laboratory, which indicated that the bricks did not meet the standards for common brick, specifically with respect to the rate of absorption. Milbratz testified that the bricks used on the building should have been wetted before use because of their high initial rate of absorption. He concluded that the preparation of the bricks was inadequate. He also concluded that the overall workmanship in the construction of building No. 4 was defective.

Because of the lack of bond between the bricks and mortar on building No. 4, Milbratz concluded that water was seeping into the walls, causing them to deteriorate. He stated that the walls would continue to deteriorate over time if nothing were done to repair them. He characterized the defects in building No. 4 as structural in nature, such that the function of the brick was being compromised.

As to the necessary repairs, Milbratz stated that the brick needed to be removed and reconstructed in a manner which complied with standards. He concluded that tuckpointing would not be a sufficient method of repair because it would not cure the bond problem.

Milbratz then discussed the cost of repairs he considered to be necessary to correct all of the construction defects he observed at the Hills of Palos condominiums. He determined the total cost of repairs to be $1,588,376. Of that, $661,694 was the amount required to replace the exterior brickwork on building No. 4.

On cross-examination, Milbratz stated his conclusion that the damage to the Momeyers' unit was a result of a defect in construction.

Counsel for I-Del then cross-examined Milbratz as to his understanding of the term "lot line" as it applied to the fire separations Milbratz concluded were defective. Milbratz defined the term as referring to a separation of condominium units, and opined that the building code thus required a fire separation between each condominium. While he acknowledged that the code refers to a lot line as a separation of buildings, Milbratz continued to insist that his definition was

the correct one, basing this view on custom and practice in the industry.

Milbratz agreed that there was not an "immediate hazard" that the walls on building No. 4 would come "tumbling down." He also stated that his examination revealed no interior leaks in that building.

I-Del's counsel subsequently questioned Milbratz as to whether he was aware that at least six other condominium developments in Palos Hills were constructed exclusively of Chicago common brick. This resulted in a sidebar, at which counsel for I-Del informed the Association's counsel that its expert, Charles Rivkin, would testify that this was in fact true. The Association's counsel objected on the ground that I-Del had designated Paul Gordon as its liability expert. The Association argued that Rivkin had not been designated to provide testimony regarding the use of Chicago common brick or any other matter besides the cost of repairs.

The Association acknowledged Gordon's deposition testimony in which he stated that tuckpointing would cure the defects on building No. 4, and that complete restoration of the brickwork was not necessary. Rivkin in his deposition agreed. Counsel for I-Del explained that it brought Rivkin into the case because Gordon did not have any experience as a tuckpointer. Rivkin, on the other hand, had 30 years of experience working with bricks and was of the opinion that the defects on building No. 4 could be repaired primarily by tuckpointing.

William Couch was the mason contractor for the construction of building No. 4. He testified that he was "unhappy that they were using that brick." He explained that the brick was similar to a common brick but softer, and that it was less expensive than the brick used to construct building No. 1. He "mildly protested" the use of the brick and was told by I-Del's superintendent that the brick used on building No. 1 had gone up in price. Couch opined that the brick on the first building was of a higher quality.

He stated that the bricks used on building No. 4 were hosed down before being laid. This was done to ensure that the mortar would properly bond to the bricks. According to Couch, the plans did not require him to wet the bricks, but he wetted them anyway as a matter of custom and practice.

Douglas Momeyer testified that he and his wife purchased their unit in 1979 for $67,000. They lived in the unit until October of 1983, when they relocated to a single-family residence. Shortly after the Momeyers moved into the unit, they began to notice that several of the windows leaked when it rained. The most severe leakage occurred above the bay window in the dining room, where after each heavy

rainfall "water would start pouring in." The Momeyers contacted representatives of I-Del, including Gary and Jacob Weglarz, to report the problem. Within a few months, repairs were made to all but the bay window. Douglas Momeyer testified that, although several attempts were made to repair the leaking bay window, to his knowledge, the problem was not finally cured until sometime in 1987.

In August 1983, the Momeyers entered into a contract with Dale Spencer whereby Spencer was to lease the unit for a year and a half at $600 per month, and at the end of that period was to purchase the unit. The lease agreement allowed Spencer to extend the lease at the end of 18 months for an additional five months at $700 per month. It also allowed the Momeyers to double the rent and extend the lease for one year if Spencer remained on the premises without paying rent. Spencer gave the Momeyers $20,000 as earnest money for the sale of the unit.

Spencer moved into the unit in October 1983. During the rental period, Momeyer contacted Spencer regularly to inquire whether the bay window was still leaking. Each time, Spencer responded that the leaks were recurring, and each time Momeyer contacted the managing agent of the development and demanded that the problem be rectified. Spencer described the leak as "a constant pouring of water" that caused the dining room to flood.

Spencer rented the unit as agreed for 18 months. He was scheduled to close on the unit in April 1985, but notified the Momeyers of his decision not to because of the recurring leakage problem, which he considered to be a major defect in the unit. Spencer did not move out of the unit after informing the Momeyers of his decision not to purchase the unit, but remained there until September, when he was evicted. From April to September, Spencer paid the Momeyers no rent.

The Momeyers subsequently hired a realtor to lease the unit. The Momeyers received no rent on the unit until January 1986, when new renters moved in. The Momeyers paid an $800 reletting fee to compensate the realtor for finding new tenants. In July or August 1987, the Momeyers sold the unit for $95,000. They paid the realtor 6% of the sales price as commission, which amounted to $5,700.

On December 7, 1989, I-Del disclosed Paul Gordon, a structural engineer, as one of its experts. Gordon was deposed in December 1989, and was questioned concerning all of the areas of damage claimed by plaintiffs. Gordon rendered his opinions after reviewing Milbratz's reports of examination, photographs, and discovery deposition, as well as the results of tests conducted on the brick samples

taken from building No. 4. Gordon opined that the exterior brick walls of building No. 4 were structurally sound. Gordon stated that his criticism of the brick used to construct the building was limited to its departure from established standards, as indicated by the results of the tests performed on the brick samples taken by Milbratz. He added, however, that the fact that the bricks were not new could have affected their ability to pass certain absorption tests.

Gordon's examination of the brickwork on building No. 4 revealed numerous deficiencies, but Gordon concluded that there were inexpensive alternatives for the repair of the offending conditions and total reconstruction of the exterior brick walls was unnecessary. He disagreed with Milbratz's recommendations regarding the extent of needed repairs.

With respect to the issue of bond, Gordon stated that he could make no judgment as to the quality of the bond across the entire surface of the bricks on building No. 4, but stated that there was no immediate risk of the brick walls collapsing. In Gordon's view, the problems he detected were isolated and could be remedied on an individualized basis. Commenting on the results of the tests the Association conducted on the brick samples, which indicated a lack of bond between the bricks and mortar, Gordon stated that in his experience the effect of removing a brick sample from an existing structure nearly always resulted in a lack of bond. Gordon added that poor bonding would result in only minor deterioration and would not affect the structural integrity of building No. 4. In his view, the effects of the poor bond would create only localized defects. Gordon did not expect the bond to continue to decrease over time. I-Del did not offer Gordon as a witness at trial.

Although the trial was originally set for May 15, 1990, it was subsequently continued several times, and after a failed settlement, the trial was reset for February 6, 1991. After motions regarding the settlement were decided, on December 6, 1990, I-Del amended its answers to Rule 220 interrogatories (134 Ill. 2d R. 220) to add two trial experts, F. Gregory Opelka and Rivkin. I-Del described Rivkin's testimony as follows:

> "Charles T. Rivkin: Tuckpointing and Exterior Building Repair and Restoration Contractor. Mr. Rivkin will provide testimony concerning the cost of repairs to the exterior wall surfaces on building number 4. He will base his opinion on his experience in the industry as well as a personal inspection of the site. His curriculum vitae is attached."

Rivkin was not offered as an expert on the other areas of damage claimed by the Association.

The resume accompanying the foregoing designation indicated that one of Rivkin's responsibilities as president of Value Engineering Services was to provide "legal analysis and consultation and expert witness depositions and testimony in litigation involving exterior weatherproofing repair, restoration and rehabilitation work." It further advised that Rivkin conducted and participated in seminars for real estate and professional organizations on the restoration and preservation of exterior walls.

On December 28, 1990, the Association moved to bar the two experts on the ground that their disclosure was untimely. I-Del responded on January 14, 1991, in part, that "Rivkin ha[d] been designated to rebut the testimony of the plaintiffs' expert on the issue of cost of repairs to the exterior wall surfaces on Building No. 4." The Association's motion was denied on January 22, 1991, and the trial date was continued to April 1, 1991.

The Association took Rivkin's deposition on February 8, 1991. Rivkin stated that he had been engaged by I-Del "[t]o review the aspect of the case that deals with exterior masonry, the need for repairs, restoration of the walls at Palos Hills No. 4." He also stated that the purpose of his investigation was "to look at the building and try to determine what work was necessary to bring the building—the exterior walls of the building—into a weather-resistant condition."

Rivkin examined the masonry on building No. 4 and took several photographs. He reviewed the project plans, the deposition and exhibits of the Association's expert, Milbratz, as well as the depositions and exhibits of several other experts. The Association's counsel did not ask Rivkin whether his review of these documents played any role in the opinions he had formed. Rivkin was questioned as to the significance of various photographs of the building. Counsel for the Association then inquired of Rivkin his opinion regarding whether, in viewing a particular photograph, he had noticed any distress to the brick, to which he responded that there was none that he could detect or at most one brick with some minor spalling. Counsel then questioned Rivkin regarding various notes Rivkin had made during his examination of the building.

Rivkin's notes indicated a variety of operations that would be needed on various parts of the exterior masonry: "reset 50% of coping on parapets," "rebuild," "tuckpoint," "caulk," "grind and tuckpoint," "replace 150 brick," "correct drainage," and "reface." Coun-

sel did not ask Rivkin how he arrived at his opinion that different locations on the building required different remedial measures.

Rivkin was then questioned concerning pages of the Milbratz report on which he had made notes. This questioning led counsel to ask Rivkin a more general question:

"Is it fair to say that your engagement in this matter did not include determining whether or not a defect existed in construction but rather was simply limited to determining the cost of repairing any masonry distress that you noticed during your observation?"

Rivkin responded that his "purpose was to look at the building and try to determine what work was necessary to bring the building—the exterior walls of the building into a weather resistant condition." When counsel still expressed confusion as to the scope of Rivkin's testimony, counsel for I-Del stated that Rivkin would be offering his opinions, not as a construction engineer, but as someone with 30 years of experience examining masonry walls. Rivkin then added:

"Can I just add that it's impossible for me to analyze any building for repair without understanding something about how the walls were built, so whether consciously or subconsciously I deal in questions concerning the original construction."

Asked for his opinions, Rivkin stated that the construction was "typical of numerous buildings which in my experience I've observed in the Chicago area that were built in let's say the 1970s and '80s." The Association asked Rivkin no follow-up questions.

The Association then questioned Rivkin about additional notations he had made regarding the labor and materials that would be necessary to repair the walls on building No. 4. One of the problems Rivkin noted was that the cross-joints on the north end wall were not filled with mortar. Counsel established that Rivkin was testifying from his own observation and asked Rivkin if he would change his mind about the amount of tuckpointing needed on the southwest wall if he knew that as a matter of practice the cross-joints were not filled throughout the building. Rivkin replied in the negative, explaining that "the appearance of the wall fits into a category of walls that I've seen over and over for many years that I suppose relates to that standard of masonry construction." Counsel did not inquire further as to the standard of masonry construction to which Rivkin referred.

Rivkin arrived at a cost figure of $71,910 to repair building No. 4, plus a contingency factor of $7,200, for a total cost to repair of $79,110. After completing questioning on Rivkin's cost estimate, counsel for the Association asked Rivkin whether he been asked to

provide any professional opinions as to the cause of the masonry distress he had detected on building No. 4. Rivkin stated:

> "Not specifically, but in my discussion of the repairs that are needed, I had to relate the—what I see on the surface to what I presume to be the construction of the walls, and in that conversation, if I didn't express it as an opinion, obviously what I believe I saw might have come out as opinions."

Rivkin was then asked what his opinions were as to the cause of the masonry distress. Rivkin answered that the main cause was weathering, but that another cause was the failure to fully seal some joints with mortar. Counsel for the Association followed up by asking Rivkin whether he had any opinion as to whether the masonry was "deficient, either that it was improperly designed or that the work was not done in a reasonably workmanlike manner." Rivkin responded that the work was "typical of the types of buildings *** that were constructed in the last several decades, particularly low-rise type structures." Counsel again asked no follow-up questions.

Rivkin was then asked if he had been asked to give an opinion as to whether the brick complies with standards. Rivkin responded:

> "The bricks that were used on the exterior appear to be a Chicago common brick which was a description.
>
> I had never been aware, and I have to tell you I have never been concerned as to whether it has complied to any particular type of standard because it's been used in the Chicago area going back, I'm sure, into the late 1800s or before, and buildings constructed with that type of brick are everywhere including visible outside the window here, and they're standing. They're absorbing and experiencing the weather, and they keep on going.
>
> So in terms of whether they meet standards, I have never really concerned myself with them; besides which they're no longer manufactured, so to some extent it becomes an academic question."

The Association did not follow up on this response, but took the position that Rivkin had no opinion on the matter of brick standards.

Counsel for the Association finally asked Rivkin if any of the repairs he thought were necessary could have been avoided by the Association. Rivkin responded that "had the Association performed tuckpointing early on, taken some normal, preventive measures that would be in line with the location and weathering conditions affecting the building, that the amount of work that [he] saw could be possibly

significantly less." He stated that in his opinion the masonry work on building No. 4 was performed within workmanlike parameters.

At trial, a side-bar was conducted at which counsel for the Association objected to Rivkin testifying in place of Gordon to other than the cost of repairs on building No. 4. The trial court inquired of counsel whether he understood from I-Del's counsel's remarks at the deposition whether Rivkin was expected to testify on the overall structural integrity of the building. He replied in the negative. The trial court later inquired of counsel for the Association how Rivkin could testify to what had to be done without also giving an opinion as to the construction itself, specifically as to whether or not it was defective. Nevertheless, the trial court ultimately ruled that Rivkin's testimony regarding the extent of repairs needed was barred because his Rule 220 designation only indicated that he would testify to the cost of repairs, and not the need for and extent of the repairs as well.

I-Del first contends that the trial court erred in granting the Association's motion to bar Rivkin from testifying at trial to any matter besides the cost of repairing the exterior masonry on building No. 4. The decision to impose Rule 220 sanctions for failure to disclose an expert witness lies within the sound discretion of the trial court and will not be overturned absent a showing of clear abuse. (*Continental Concrete Pipe Corp. v. Century Road Builders, Inc.* (1990), 195 Ill. App. 3d 1, 9, 552 N.E.2d 1032, 1038.) Supreme Court Rule 220 (134 Ill. 2d R. 220) was designed to eliminate surprise at trial by requiring the disclosure of experts and the basis of their opinions in a timely manner prior to trial. Accordingly, the rule provides that the testimony of an expert at trial may neither be inconsistent with nor go beyond the fair scope of facts known or opinions disclosed in the discovery proceedings. (134 Ill. 2d R. 220(d).) It further provides, however, that an expert "shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." (134 Ill. 2d R. 220(d).) If the extent of an expert's opinion is not developed during his deposition because the opposing attorney does not ask follow-up questions, then he is not barred from stating opinions at trial merely because such opinions were not stated during his deposition. See *Fogarty v. Parichy Roofing Co.* (1988), 175 Ill. App. 3d 530, 529 N.E.2d 1055.

The Association argues that Rivkin's testimony was properly limited at trial because I-Del in fact disclosed that he would testify only to the cost of repairing building No. 4, and Gordon, I-Del's primary expert, would testify as to the existence of construction defects and the steps that were necessary to remedy them. The Association con-

tends that I-Del secured the services of Rivkin "at the eleventh hour" to testify about defects in the construction of building No. 4 after it determined that Gordon's opinions were more beneficial to the Association. The Association further contends that the expert testimony I-Del sought to elicit from Rivkin far exceeded the facts known or opinions disclosed in I-Del's designation of Rivkin and in Rivkin's deposition, and were in fact developed in an unauthorized site visit made by Rivkin during the course of the trial. The specific opinions of Rivkin to which the Association refers relate to the issue of the bonding of the bricks and mortar, which, the Association argues, were contrary to the opinions expressed by Gordon, who agreed with Milbratz that the bond was poor.

■■ It is difficult to believe that a man of Rivkin's expertise, with over 30 years of experience examining masonry walls, would render opinions on the cost of repairs to building No. 4 without testifying that those repairs in fact constituted the necessary restoration and rehabilitation work. We believe that the Association was placed on notice at Rivkin's deposition that Rivkin would testify to the types of repairs he considered necessary to restore building No. 4 to a weather-resistant condition. Accordingly, we conclude that the trial court abused its discretion in limiting Rivkin's trial testimony to the cost of repairs.

Our review of the record indicates that when counsel for the Association asked Rivkin at his deposition what he had been engaged to do, Rivkin responded that he had been engaged "to review the aspect of the case that deals with exterior masonry, the need for repairs, restoration of the walls at Palos Hills No. 4." Contrary to what the Association argues, Rivkin's designation was not limited to determining the cost of tuckpointing, nor did his deposition testimony so reflect. Rather, Rivkin's designation stated that he would testify concerning the cost of *repairs* to the exterior wall surfaces on building No. 4, based on his experience in the industry as a tuckpointer and exterior building repair and restoration contractor. Moreover, Rivkin's deposition transcript reveals that he made copious notes as to what steps, in addition to tuckpointing, were necessary to bring the walls on building No. 4 into a weather-resistant condition.

Rivkin stated that he reviewed the project plans, the deposition and exhibits of Milbratz, which included his analysis of the bond, and the depositions and exhibits of several other experts. Counsel did not ask Rivkin whether his review of these documents played a role in the opinions he had formed. Further, counsel walked Rivkin through a review of detailed notes Rivkin had made regarding a variety of opera-

tions that Rivkin determined would be needed on various parts of the exterior masonry, such as rebuilding, tuckpointing, caulking, grinding, and replacing portions of brick. Yet, counsel did not inquire of Rivkin how he arrived at his opinion that different locations on the building required these different remedial measures.

Counsel also inquired of Rivkin what his opinions were as to the cause of the masonry distress on building No. 4, to which Rivkin responded that the main cause was weathering, and that another cause was failure to fully seal some joints with mortar. Although, as I-Del points out, unfilled joints would appear to be related to the question of brick and mortar, counsel never asked Rivkin if he had any opinion as to the bond.

Rivkin also explained in his deposition that it was impossible for him to analyze any building for repair without understanding something about how the walls were built. Counsel for the Association then asked Rivkin to state his opinions as to the original construction of building No. 4, and Rivkin opined that the construction was typical of numerous buildings which he had observed in the Chicago area. Counsel asked no follow-up questions to this response.

At the deposition, the Association also asked Rivkin his opinion as to the brick's compliance with standards, to which Rivkin responded that the bricks that were used appeared to be a Chicago common brick, and that he was not concerned with their compliance with any particular standards because this type of brick had been used in the Chicago area for many years and was functioning. Again, the Association did not follow up on this response.

From the foregoing, it is apparent to us that Rivkin was not going to testify about the cost of repairs without also testifying that those repairs in fact constituted the necessary restoration and rehabilitation work on building No. 4. Because of Rivkin's extensive experience dealing with masonry walls, I-Del chose to rely exclusively on his testimony and decided not to call Gordon, which was within its discretion to do. Significantly, at his deposition, Gordon expressly stated that he had not been engaged in this matter to provide a detailed breakdown of the necessary repairs and associated costs relating to the exterior masonry of building No. 4, which is further evidence that this was the role of Rivkin.

In our view, Rivkin's deposition sufficiently placed the Association on notice that Rivkin would rebut the testimony of Milbratz as to the extent and, accordingly, the cost of repair. Moreover, in its response to the Association's motion to bar Rivkin's testimony, I-Del expressly stated that Rivkin would rebut the testimony of Milbratz as to the

cost of repairs concerning building No. 4. As I-Del points out, it was not incumbent upon Rivkin to furnish opinions on every possible aspect of Milbratz's opinion at his deposition. Counsel for the Association, rather, had a duty to discover such opinions.

Moreover, we are unpersuaded by the Association's contention that the opinions Rivkin held at the deposition changed at the trial. Our review of the record indicates that both Rivkin and Gordon concluded that, contrary to Milbratz's opinion, the entire replacement of the brick walls was not necessary, but that instead there were other, less drastic options for repair, correction and maintenance. As to the bond, although the Association is correct that Gordon agreed with Milbratz that the test samples indicated a poor bond, both Gordon and Rivkin opined that the bond was likely adversely affected by the extraction of the samples from the wall. Thus, the Association should not have been surprised by Rivkin's testimony in this regard. (In fact, Gordon expressly stated that he could make no judgment as to the quality of the bond across the entire brick surface because he could not see past the face of the brick.) Rivkin had planned to testify that the samples were irrelevant in arriving at his overall conclusion, based on his 30 years of experience in examining masonry walls, that building No. 4 was structurally sound and could be made weather resistant with the repairs he outlined, which did not include complete restoration of the masonry walls. The record reveals that this was an opinion in which Gordon concurred.

In light of the foregoing, we conclude that the trial court erred in limiting Rivkin's trial testimony to the cost of repairs. Rivkin should have also been permitted to give his opinions as to the repairs which he determined were necessary to bring building No. 4 into a weather-resistant condition. As I-Del points out, the result of the trial court's ruling was to exclude testimony by Rivkin on matters that were addressed at his deposition. This was extremely prejudicial to I-Del and constitutes reversible error.

In light of the fact that we are reversing this matter and remanding for a new trial, we will consider the remaining issues raised by I-Del which are likely to recur in the new trial.

I-Del next argues that the trial court erred in refusing to submit its special interrogatory to the jury. I-Del proffered two special interrogatories, inquiring whether certain language contained in the purchase agreement was valid and enforceable to disclaim the implied warranty of habitability. I-Del presented a first special interrogatory for the court's consideration. The trial court found that the language

of the interrogatory was unclear and refused it. I-Del then offered an alternative special interrogatory:

"Did the Plaintiff Hills of Palos Condominium Association, Inc. waive its rights agreeing to the following language contained in Paragraph 23 of the Purchase Agreement by signing the contract directly below the disclaimer:

'No representations, warranties, undertakings or promises other than those expressed herein whether oral, implied or otherwise shall be considered a part of this transaction.'

Answer: 'Yes' or 'No' only."

The trial court responded initially that the special interrogatory did not "really go to the ultimate issue in the case." It again expressed dissatisfaction with the wording, and stated that it did not like the concept of special interrogatories, and that to some extent, special interrogatories undermined our faith in the jury. The court then refused the interrogatory.

The purpose of special interrogatories is not to instruct the jury but to serve as a check upon the jury's deliberations by testing the jury's general verdict against its determination on the ultimate fact at issue in the special interrogatory. (*Lundquist v. Nickels* (1992), 238 Ill. App. 3d 410, 433, 605 N.E.2d 1373, 1389.) A special interrogatory is not proper unless it relates to an ultimate fact of the case and unless an answer responsive to it would be inconsistent with some general verdict which might be returned upon the issues in the case. *Ross v. Aryan International, Inc.* (1991), 219 Ill. App. 3d 634, 650, 580 N.E.2d 937, 947.

Section 2—1108 of the Illinois Code of Civil Procedure dictates when a special interrogatory is to be used:

"The jury may be required by the court, and *must be required on request of any party*, to find specially upon any material question or questions of fact submitted to the jury in writing. \*\*\* When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 2—1108.)

As is evident, the proffered special interrogatory sought to test the jury's general verdict as to count I of the complaint, which alleged that I-Del breached the implied warranty of habitability. We cannot predict what evidence will be offered in the retrial, but we conclude that the trial court erred in refusing to submit a special interrogatory designed to test the jury's determination that I-Del breached the implied warranty of habitability. Such an interrogatory would have

tested the ultimate issue of whether an implied warranty of habitability in fact existed to enable the Association to recover damages.

The Association argues that the special interrogatory was improper in form because it referred to the Association "waiv[ing] its rights" and "signing the contract directly below the disclaimer" when in fact it was the individual unit owners who signed the contract. This objection as to form, however, was not raised in the trial court, so as to give I-Del an opportunity to address and cure it. At oral argument before this court, counsel for the Association admitted that a special interrogatory testing the jury's finding that I-Del breached the implied warranty of habitability could have been drafted to his satisfaction.

Moreover, the foregoing comments of the trial court reveal that the real reason it refused to submit the special interrogatory was because it "didn't like the concept" and did not believe that it should "seek an inconsistency." This reasoning contradicts the express mandate of section 2—1108, which requires that special interrogatories be submitted upon the request of a party, provided they are in proper form. (Ill. Rev. Stat. 1989, ch. 38, par. 2—1108.) Accordingly, we believe that a special interrogatory testing the jury's verdict as to the existence of the implied warranty should have been given. In refusing to give such an interrogatory, the trial court erred.

I-Del also contends that it was entitled to a judgment notwithstanding the verdict as to count I of the Association's fifth amended complaint because the evidence did not support the jury's finding that I-Del breached the implied warranty of habitability. The law is well established in Illinois that a verdict based on conflicting evidence should not be disturbed on appeal unless it is contrary to the manifest weight of the evidence; that is, an opposite conclusion must be clearly evident. *Career Opportunities Inc. v. Grant, Wright & Baker, Inc.* (1981), 91 Ill. App. 3d 984, 987, 415 N.E.2d 463, 465.

I-Del argues that the implied warranty of habitability was effectively disclaimed by the language in two paragraphs of the purchase agreement. In *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 43, 389 N.E.2d 1154, 1159, our supreme court held that a disclaimer of the implied warranty must be strictly construed against the builder-seller and will not be readily implied. The burden is on the builder-seller to prove that the buyer knowingly waived the protections afforded him under the implied warranty. *Petersen*, 76 Ill. 2d at 43, 389 N.E.2d at 1159.

■ Here, no reference was made in either paragraph of the term "habitability" or to the warranties of "merchantability" or "fitness

for a particular purpose." Furthermore, neither paragraph disclosed the consequences of their inclusion concerning the disclaimer of the implied warranty of habitability. Moreover, the clauses were of the same size and type of print as all the other clauses in the contract. (See *Tassan v. United Development Co.* (1980), 88 Ill. App. 3d 581, 410 N.E.2d 902; *Herlihy v. Dunbar Builders Corp.* (1980), 92 Ill. App. 3d 310, 415 N.E.2d 1224.) Under these circumstances, we cannot say, as a matter of law, that the clauses were sufficient to disclaim the implied warranty of habitability. The trial court properly found that I-Del was not entitled to a judgment notwithstanding the verdict as to count I in this regard.

I-Del next contends that, even if the purchase agreement contained an implied warranty of habitability, the Association failed to demonstrate that I-Del breached that warranty. Without discussion, we believe otherwise. The testimony of Milbratz alone was sufficient to demonstrate that serious defects were caused by I-Del, were latent, and interfered with a purchaser's legitimate expectation that his condominium and portion of the common elements were reasonably suited for their intended use as a residence. The evidence in the record could support a finding that I-Del breached the implied warranty of habitability. See, *e.g., Petersen,* 76 Ill. 2d 31, 389 N.E.2d 1154; *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.* (1985), 134 Ill. App. 3d 402, 480 N.E.2d 833.

I-Del next cites as reversible error several of the trial court's rulings pertaining to the measure of damages and the admission of certain testimony of the Association's appraisal expert. We consider each of these rulings in turn.

I-Del first argues that the trial court erred in refusing to instruct the jury as to the proper measure of damages. I-Del characterizes this issue as a question of law to be decided by the trial court, not the jury. Had the trial court decided this question of law, I-Del contends, it would have determined that the appropriate measure of damages was the diminution in the value of the condominiums attributable to the defects in construction, and the jury would have concluded from the evidence presented that there in fact was no diminution in value.

Instead of instructing the jury as to the measure of damages to apply, the trial court, relying on our supreme court's holding in *Park v. Sohn* (1982), 89 Ill. 2d 453, 433 N.E.2d 651, issued the following instruction:

> "If you decide for the Plaintiff, the Hills of Palos Condominium Association, Inc., on the question of liability under Count I (Breach of Implied Warranty of Habitability), you must then fix

the amount of money which will reasonably and fairly compensate it for any of the following elements of damages proved by the evidence to have resulted from the breach of the Defendant.

The measure of damages to real property is determined by the reasonable expense of necessary repairs to the property which was damaged. If, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or if correcting them would entail unreasonable destruction of the builder's work, the amount by which the defects have reduced the value of the property should be the measure of damages.

Whether any of these elements of damages has been proved by the evidence is for you to determine."

We agree with the Association that in this case, only the jury could determine which measure of damages to apply because the alternative measure could only be applied after a factual finding that the cost of repair was unreasonably disproportionate to its benefit or that correcting the defects would entail an unreasonable destruction of the property.

I-Del also argues that the Association presented no evidence of diminution of value. We disagree. William Murphy, the Association's appraisal expert, testified that fundamental appraisal theory equates diminution of value with the cost of repair. As applied here, Murphy stated that the construction defects in question reduced the market value of the condominiums by the cost of the repairs as determined by a qualified expert.

I-Del points to Murphy's testimony in which he agreed that as compared to other properties, the prices at which Hills of Palos condominiums were selling did not reflect a diminution of value. However, during direct examination, Murphy explained that this was so because in many instances, buyers are uninformed as to defects which exist in a particular property. Murphy defined the sales price as the amount a buyer pays for a property. He defined market value, on the other hand, as the amount a knowledgeable buyer would pay for a property when he is dealing with a knowledgeable seller. According to Murphy, diminished value is not solely proven by statistical analysis of actual sales because actual sales do not necessarily reflect the diminution in value. Murphy opined that buyers of the subject condominiums were not fully informed as to the extent of the construction defects and accordingly paid more for their respective properties than they were worth, adding that many did not know that they could eventu-

ally be responsible for a percentage of the costs incurred to correct the construction defects.

Moreover, contrary to I-Del's contention, Murphy was qualified to render an opinion regarding the commonly used method in the appraisal industry of ascertaining diminution of value, notwithstanding that he was unable to offer an opinion about the actual cost of repairs. He stated that it was common practice to rely on the cost estimates of a qualified expert in determining the market value of property. The jury was entitled to hear this testimony.

■■ I-Del also argues that the trial court's rulings with regard to its real estate expert, Gregory Opelka, were improper and prejudicial. I-Del first asserts that the trial court erred in permitting a hypothetical question to be posed to its appraisal expert. Here, the hypothetical was based on the testimony of Murphy, who opined that the market value of a property is diminished by the cost of repair. Thus, the hypothetical was appropriate as a test of Opelka's testimony that the market value was not diminished and that any costs of repair were already reflected in the purchase price. Accordingly, the trial court did not err in allowing the hypothetical. We agree with I-Del, however, that the trial court erred in refusing to allow I-Del on redirect examination to substitute in the hypothetical those facts testified to earlier by Opelka which conformed to I-Del's theory of the case. See *Coriell v. Industrial Comm'n* (1980), 83 Ill. 2d 105, 413 N.E.2d 1279.

■■ I-Del also maintains that Opelka's testimony regarding the rates of appreciation of other properties, which he ascertained after the Association took his deposition, was improperly stricken. I-Del argues that Opelka's testimony should have been allowed because it did not involve a "shift in theory or belief." We agree with I-Del that the undisclosed opinion did not represent a shift in theory. I-Del's argument ignores, however, Rule 220(d), which provides:

> "To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through *** depositions ***, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. ***" (134 Ill. 2d R. 220(d).)

(See also *Marshall v. Osborn* (1991), 213 Ill. App. 3d 134, 145, 571 N.E.2d 492, 500.) The analyses which Opelka performed after his deposition provided additional bases for his opinion that the Hills of Palos condominiums increased at a rate comparable to other properties, of which the Association was not apprised. Had the court permitted this testimony, the Association would have been unable to show

the jury the limited information upon which Opelka based his opinion at the time of his deposition. Rule 220 states that an expert's testimony at trial "may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed" during discovery. (134 Ill. 2d R. 220.) In light of this rule, Opelka's testimony was properly stricken.

■■ As a final matter with regard to Opelka, I-Del argues that the trial court erred in refusing to allow him to testify as to the meaning of the term "lot line," despite his status as an expert in the condominium industry. Opelka's testimony was offered in an attempt to rebut the testimony of the Association's expert, Milbratz, who defined "lot line" as a separation between two condominiums. "Lot line" became an issue in determining whether the failure to build fire separations in the attics of the condominiums constituted a construction defect.

We find that the trial court did not abuse its discretion in precluding the testimony of Opelka in this regard. While Opelka may have been qualified to give his opinion of the meaning of "lot line," that was not the purpose for which he was called to testify. Accordingly, I-Del was limited to attacking Milbratz's testimony regarding the definition of "lot line" by means of cross-examination, and the record indicates that it availed itself of this opportunity. We find no error in the trial court's ruling.

Defendant next asserts that the trial court erred in refusing to give Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971), which allows the jury to draw an adverse inference from a party's failure to produce a witness.

■■ I-Del contends that the failure of the Association to produce the testimony of individual unit owners created a presumption that the evidence, if produced, would have been adverse to it. We believe that such testimony would have been merely cumulative and, further, that individual unit owners were equally available and accessible to I-Del. See *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 549 N.E.2d 1295.

In short, we cannot say that the circumstances present in this case would have justified the giving of the missing witness instruction. The giving of that instruction would have had the effect of implying to the jury that the Association was hiding evidence from I-Del. (*Thompson,* 193 Ill. App. 3d at 204, 549 N.E.2d at 1306.) The evidence does not support such an implication. Accordingly, the trial court properly refused to give the instruction.

■■■ I-Del also argues that the court erred in allowing the Association to question Weglarz, I-Del's president, regarding I-Del's previously filed complaint against the brick manufacturer and masons, which in turn forced I-Del to raise, before the jury, the issue of insurance. I-Del filed a complaint against the two parties alleging that the brick on building No. 4 was defective and that the bricks had been improperly laid. I-Del sought damages of $500,000. I-Del contends that the line of questioning put to Weglarz in this regard was irrelevant and unduly prejudicial. We disagree. The Association offered this testimony in part to rebut Weglarz's earlier testimony, brought out during questioning by Weglarz's own attorney, that he believed only about 5% of the brick on building No. 4 was defective. In the complaint filed by I-Del against the brick manufacturer and masons, however, I-Del alleged that *all* of the bricks were defective and needed to be replaced. The Association had a right to highlight this discrepancy. While this testimony damaged I-Del's case, we do not find that the line of questioning complained of was unduly prejudicial.

Moreover, I-Del took the opportunity to diminish any damage caused by the foregoing line of questioning by bringing out the fact that I-Del's case against the brick manufacturer and mason settled for only $40,000 and $15,000, respectively, creating an inference that the damage to building No. 4 was not as extensive as I-Del had represented in its complaint.

As to the later reference to insurance, I-Del argues that it was forced to bring out Weglarz's testimony regarding whether the brick manufacturer and mason had insurance to cover their damages after the Association elicited testimony from Weglarz that the companies had subsequently gone out of business. We see no relevance, for purposes of this lawsuit, in the fact that the companies no longer existed or that they had insurance to cover losses sustained in the suit filed by I-Del. Testimony in both regards was properly stricken by the trial court as immaterial. In the retrial, such testimony should be barred.

I-Del next contends that the trial court erred in denying its motion for a directed verdict against the Momeyers. The jury found that I-Del breached the express warranty to keep the Momeyers' windows free from leaks. Accordingly, it awarded the Momeyers $7,800 in consequential damages arising from water leakage into the interior of their unit through the bay window. I-Del initially argues that the Momeyers disclaimed their right to consequential damages by signing the purchase agreement, which contained an express exclusion of such damages.

The Momeyers appear to argue that, even if they did disclaim their right to consequential damages under the theory of express warranty, they nevertheless could prevail under the implied warranty of habitability. In this regard, the Momeyers contend that I-Del failed to demonstrate that they knowingly waived their rights under the implied warranty, as required by our supreme court in *Petersen* (76 Ill. 2d 31, 389 N.E.2d 1154).

We agree with the Momeyers that they could still prevail under the theory of implied warranty notwithstanding the jury's finding that damages were proper under the theory of express warranty. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.) We also agree with the Momeyers that sufficient evidence exists to support a jury finding that I-Del did not demonstrate a knowing waiver of the implied warranty of habitability.

However, under the implied warranty, the proper measure of damages in this instance is the cost of repair. (*Park v. Sohn*, 89 Ill. 2d 453, 433 N.E.2d 651.) Momeyer testified that the leaks have been repaired at no cost to him. Hence he has suffered no damages under the implied warranty. *Nisbet v. Yelnick* (1984), 124 Ill. App. 3d 466, 464 N.E.2d 781, which the Momeyers cite in support of their contention that a buyer can recover consequential damages for breach of the implied warranty of habitability, was limited in its holding to a situation where defects in the home were so extensive that the entire home was, in fact, uninhabitable. In that specific instance, we held that damages for loss of use were appropriate. We find the facts in that case to be inapposite to those here, and we decline to extend its holding to a situation wholly different than that presented there.

■■ In sum, we conclude that the jury's award of consequential damages in favor of the Momeyers for breach of express warranty was against the manifest weight of the evidence, in light of the clause in the purchase agreement specifically disclaiming such damages. Moreover, we hold that the Momeyers may not, under the circumstances presented here, recover for consequential damages under the implied warranty of habitability. Parenthetically, we add that the jury's award of damages of $2,800 in favor of the Association under count II may stand, as the damages it sought were for costs to repair the defective roofs, roof flashings and windows.

I-Del next assigns as error the trial court's refusal to enforce a settlement agreement reached by the parties on July 27 and August 30, 1990. On July 27, 1990, a settlement conference was held at the offices of Resolve Dispute Management, Inc., for the purpose of investigating the possibility of a settlement of the claims in this matter.

Present at the conference were attorneys for I-Del; attorneys and a representative of two third-party defendants; a representative of I-Del's insurer; counsel for the Association, Stephen Sharp; and Sirovatka. After several hours of discussion and negotiation, an offer was made to Sharp by counsel for the various defendants. This offer was subsequently rejected by Sharp.

On August 30, 1990, a second settlement conference was held. In attendance were the attorneys representing I-Del, counsel for the third-party defendants, and Sharp. After several more hours of discussion and negotiation, an offer was made to Sharp by counsel for defendants in the amount of $243,000 plus the performance of certain work, known as the final lift, which was deemed to be worth $25,000, in full and final settlement of all claims against I-Del.

On Tuesday, September 4, 1990, Sharp indicated to Robert Farrar, counsel for I-Del, that the offer was acceptable to his clients. When Farrar stated that he would draft the documents necessary to effectuate the settlement that had been reached, Sharp informed him that he did not represent four of the individual plaintiffs named in the fifth amended complaint, namely, the Momeyers, Richard Pezzopane, and Blazek, and accordingly, that the claims of these plaintiffs were not included in the settlement that had been reached.

I-Del asserts that it was the understanding of all counsel for all defendants that the amount offered to Sharp was in complete settlement of the claims of all plaintiffs in the lawsuit. I-Del further asserts that at no time during either settlement discussion did Sharp state that he was not representing all of the plaintiffs in the lawsuit, and offered in support of this the affidavit of Brian P. Muldoon, an employee of Resolve, who stated that Sharp advised him that he had "full settlement authority," and that he was "under the impression" that Sharp represented all of the plaintiffs in the lawsuit.

A settlement agreement is a contract, and construction and enforcement of settlement agreements are governed by principles of contract law. (*Haisma v. Edgar* (1991), 218 Ill. App. 3d 78, 87, 578 N.E.2d 163, 168.) For a contract to exist, there must be an offer and acceptance, and to create a binding contract, the acceptance must comply strictly with the terms of the offer. Acceptance requesting modification or containing terms that vary from those offered constitutes a rejection of the original offer and becomes a counterproposal that must be accepted by the original offeror before a valid contract is formed. *Loeb v. Gray* (1985), 131 Ill. App. 3d 793, 799, 475 N.E.2d 1342.

■■ In this case, counsel for defendants made an offer to Sharp in the amount of $243,000 plus the performance of the final lift, worth $25,000, in full and final settlement of all claims. Sharp maintains that all counsel for defendants knew that he represented only the Association and one other party (who is not at issue in this appeal), but did not represent plaintiffs Momeyers, Blazek, or Pezzopane. Defendants, on the other hand, contend that Sharp represented to them that he was counsel for all plaintiffs. It is precisely because of this dispute as to representation that the settlement cannot be enforced.

One of the key terms of the offer made by defendants was that it be in full and final settlement of *all* claims in the lawsuit. Sharp was in no position to accept this term because he did not represent all the plaintiffs bringing claims and had no authority to act on their behalf. Thus, Sharp's acceptance of the sum of $268,000 was insufficient to form a binding contract to settle the claims of all the parties to the lawsuit. Sharp's "acceptance" was really a counteroffer because it injected a new term, namely, that only those plaintiffs which Sharp did in fact represent would settle in exchange for the offered amount. Accordingly, the trial court properly denied I-Del's motion to enforce the settlement.

After the trial court denied defendants' motion to enforce settlement, I-Del and the third-party defendants filed a motion for sanctions against Sharp for the costs they incurred in participating in the settlement negotiations. After a brief hearing conducted on January 10, 1991, the trial court found that Sharp had filed service lists that were not well grounded in fact and filed pleadings on behalf of parties he did not represent. The court accordingly granted defendants' motion for sanctions and awarded I-Del $24,002.55, American Brick Company $2,726.25, and C&W Masonry $2,580. Sharp appeals from the trial court's order granting the sanctions.

■■ The decision whether to impose sanctions is within the sound discretion of the trial judge and will not be reversed on appeal absent an abuse of discretion. (*In re Estate of Smith* (1990), 201 Ill. App. 3d 1005, 1009, 559 N.E.2d 571, 573.) However, "the predicate to such deference is that the circuit court make an informed and reasoned decision." (*Smith*, 201 Ill. App. 3d at 1009, 559 N.E.2d at 573.) This can best be achieved by conducting an evidentiary hearing to give the parties involved an opportunity to present any evidence needed to substantiate or rebut the claim for sanctions, and an opportunity to argue their positions. (*Smith*, 201 Ill. App. 3d at 1009, 559 N.E.2d at 574.) Although a hearing was held in this case on the motion for sanc-

tions, the record reveals that no evidence was taken at that hearing. In light of the many disputed facts concerning Sharp's conduct and the true understanding of the parties as to whom Sharp in fact represented, we conclude that a full evidentiary hearing should have been conducted. Accordingly, we need not set forth, at this juncture, what would undoubtedly be a long and tedious statement of the facts surrounding this issue. The order appealed from is vacated, and this cause remanded for an evidentiary hearing as to the issue of sanctions against Sharp.

The Association makes a separate appeal challenging the trial court's dismissal of Weglarz, president of I-Del, as a party defendant to the subject lawsuit. Before addressing this issue, it is necessary to review the history of allegations raised by the Association against Weglarz in its various amended complaints.

In the first amended complaint, filed October 14, 1983, the Association named Weglarz as a defendant, alleging that "Jacob Weglarz at all times pertinent hereto was and is President and registered agent of I-Del." Because no facts were alleged that would support a finding of personal liability on the part of Weglarz, the trial court, on June 7, 1984, dismissed Weglarz as a defendant.

In the second amended complaint, filed January 11, 1985, the Association again attempted to state a cause of action against Weglarz on the basis of the same allegations. On August 15, 1985, the trial court again dismissed Weglarz from this action.

The Association's third and fourth amended complaints, filed November 4, 1985, and October 10, 1986, respectively, contained no allegations against Weglarz.

On March 13, 1990, the trial court granted the Association leave to file another amended complaint. In this fifth amended complaint, the Association again attempted to add Weglarz as a defendant, alleging:

> "Weglarz dominated I-Del, and there was such unity of interest between I-Del and Weglarz that I-Del was merely the alter ego of Weglarz. Moreover, Weglarz treated the assets of I-Del as his own in that Weglarz used I-Del's assets to satisfy Weglarz's personal obligations."

In response to this latest allegation, the trial court on May 7, 1990, issued an order ruling:

> "(1) Jacob Weglarz is dismissed with prejudice from this matter[], the allegations against him being nothing more than an attempt to pierce the corporate veil for actions that occurred long after the acts that form the basis of this suit.

(2) In the event a judgment is taken against I-Del and I-Del were unable to satisfy the judgment, then, and only then, a suit to pierce the corporate veil would be allowable either by way of a citation to discover assets or a chancery action to pierce the corporate veil."

On May 10, 1990, the trial court denied the Association's motion for leave to file its sixth amended complaint and denied subsequent motions by the Association to reconsider that ruling. In that complaint, the Association alleged that Weglarz transferred eight units of the Hills of Palos condominiums, with a value of approximately $650,000, to Talman Federal Savings and Loan Association of Illinois to satisfy personal obligations related to his guarantee of a loan relating to another development.

The Association contends that the trial court erred in dismissing its fifth amended complaint against Weglarz and in denying its motion for leave to file its sixth amended complaint. We first address whether the trial court erred in dismissing the fifth amended complaint against Weglarz.

To state a cause of action, a complaint must be legally sufficient, setting forth a legally recognized claim as its basis for recovery, as well as factually sufficient, pleading facts which bring the claim within the legally recognized cause of action alleged. (*J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.* (1991), 213 Ill. App. 3d 510, 512, 572 N.E.2d 1090, 1091-92.) To withstand a motion to dismiss, a pleader must set forth ultimate facts giving rise to the cause of action or defense for which relief is requested. (*Strode v. Becker* (1990), 206 Ill. App. 3d 398, 403, 564 N.E.2d 875, 878.) A complaint may not rest upon conclusions of fact unsupported by allegations of specific facts from which such conclusions may be drawn. *J. Eck & Sons*, 213 Ill. App. 3d at 515, 572 N.E.2d at 1093.

■■ The Association filed its complaint against Weglarz to "pierce the corporate veil" so as to make him individually liable for damages in this action. Piercing a corporate veil is a task which courts should undertake reluctantly. (*Pederson v. Paragon Pool Enterprises* (1991), 214 Ill. App. 3d 815, 819, 574 N.E.2d 165, 167.) In order to pierce the corporate veil: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that an adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice. *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004, 415 N.E.2d 560, 563-64.

The decision to disregard the corporate entity does not generally rest on a single factor but involves the consideration of many factors, such as inadequate capitalization, failure to issue stock, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time, nonfunctioning of other officers or directors, absence of corporate records and whether in fact the corporation is only a mere facade for the operation of the dominant stockholders. *Gallagher*, 91 Ill. App. 3d at 1004, 415 N.E.2d at 564.

■■■ Paragraph 10 of the fifth amended complaint alleged that Weglarz "was President of I-Del and at all relevant times an owner of at least 80% of the stock of I-Del." These facts, standing alone, are insufficient to pierce the corporate veil. Dominant stock ownership alone does not create an identity of interest as an alter ego. See *Import Sales, Inc. v. Continental Bearings Corp.* (1991), 217 Ill. App. 3d 893, 903-04, 577 N.E.2d 1205, 1212.

In paragraph 11 of the complaint, the Association alleged that "Weglarz dominated I-Del, and there was such unity of interest between I-Del and Weglarz that I-Del was merely the alter ego of Weglarz," and that "Weglarz treated the assets of I-Del as his own in that Weglarz used I-Del's assets to satisfy Weglarz's personal obligations." Both allegations amount to conclusory statements unsupported by allegations of *specific* facts upon which the conclusions rest and are therefore insufficient to withstand a motion to dismiss. *Appleby v. Miller* (1990), 197 Ill. App. 3d 533, 536, 554 N.E.2d 773, 775.

We turn next to the Association's related contention, that the trial court erred in denying the Association's motion for leave to file its sixth amended complaint. The trial court has broad discretion in motions to amend pleadings, and a denial of a motion to amend is not erroneous unless there has been a manifest abuse of discretion. *Tongate v. Wyeth Laboratories* (1991), 220 Ill. App. 3d 952, 970, 580 N.E.2d 1220, 1233.

In this case, the Association had five different opportunities to amend its complaint to state a cause of action against Weglarz. It attempted unsuccessfully in the first two amended complaints, and made no attempts in the third and fourth amended complaints. Then, nearly 3½ years after filing the fourth amended complaint, the Association filed yet another amended complaint in which it attempted, again unsuccessfully, to state a cause of action against Weglarz. Under these circumstances, we cannot say that the trial court abused its discretion in refusing yet another effort on the part of the Association, made over 6½ years after the start of this action and nearly that long

after the alleged misappropriation by Weglarz, to state a cause of action against Weglarz.

Moreover, even had the trial court granted the Association leave to file its sixth amended complaint, we conclude, as a matter of law, that the allegations against Weglarz would have been insufficient to pierce the corporate veil. The decision to disregard the corporate entity does not, as we have stated, rest on a single factor, but involves the consideration of many factors. (*Gallagher*, 91 Ill. App. 3d 999, 415 N.E.2d 560.) In neither the fifth nor sixth amended complaint did the Association allege that I-Del was inadequately capitalized, that it failed to issue stock, observe corporate formalities, such as electing officers and holding board meetings, or pay dividends, that other officers or directors of I-Del were nonfunctioning, that corporate records did not exist, or that the observance of the fiction of separate corporate existence would sanction a fraud or promote injustice against the Association. The Association alleged only that on one occasion, Weglarz used property belonging to I-Del to satisfy an obligation "that was not entirely I-Del's." On the basis of this single alleged transaction, we cannot conclude that I-Del existed as merely a sham corporation exclusively for the benefit of Weglarz.

In light of our decision, we uphold that portion of the trial court's order dismissing Weglarz with prejudice from this action. That portion of the order allowing the Association to bring an action against Weglarz to pierce the corporate veil in the event I-Del is unable to satisfy a judgment against it is hereby vacated.

In view of our holding that this matter must be reversed for a new trial, we need not address I-Del's additional contention that the trial court's questioning of a juror regarding the juror's unauthorized visit to the condominium complex constituted reversible error. This issue is unlikely to recur in the new trial.

For the foregoing reasons, the judgment of the circuit court of Cook County in favor of the Association as to count I of its fifth amended complaint is reversed and the matter remanded for a new trial. The judgment of the circuit court awarding consequential damages of $7,800 to the Momeyers under count II of the complaint is reversed. The judgment in favor of the Association for damages of $2,800 under count II is affirmed. As to the separate appeal of I-Del to enforce settlement, the judgment of the circuit court is affirmed. As to I-Del's motion for sanctions, the judgment of the circuit court is vacated, and the caused remanded for an evidentiary hearing. Finally, as to the Association's separate appeal challenging

the trial court's dismissal of Weglarz as a party defendant, the judgment of the circuit court is affirmed in part and vacated in part, in accordance with this opinion.

Affirmed in part; reversed in part and remanded in part.

EGAN and RAKOWSKI, JJ., concur.