Eric AIKENS and Torrence Jamerson by themselves and for all others similarly situated, Plaintiffs,

v.

CITY OF CHICAGO, a municipal corporation, A. Byrd, # 8368, M. Ayala, # 15787, and R. Spadoni, # 10503, individually and against all police officers who made solicitation arrests from July, 1993 to the present, Defendants.

No. 93 C 5233.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 14, 2001.

Edward T. Stein, Chicago, IL, for plaintiffs.

City of Chicago Corporation Counsel, Chicago, IL, for defendants.

## ORDER

ROSEMOND, United States Magistrate Judge.

Before the Court is the *"City of Chicago's Renewed Motion To Vacate The September 30, 1997, Order Granting Intervention"*. **The motion is granted.**

To better understand the genesis of the motion, some background facts are necessary. On or around January 27, 1992, intervenor—plaintiffs Eugene Dickerson, Matthew Kleber, and The Bradley Adam Corporation filed a *"Verified Complaint"* against defendant City of Chicago seeking injunctive and declaratory relief pursuant to the First and Fourteenth Amendments to the United States Constitution, and § 1983 of Title 42 of the United States Code.[1] The caption of the action was *"Eugene Dickerson, Matthew Kleber and The Bradley Adam Corporation v. City of Chicago."* The action bore Case No. 92 C 665. The then assigned District Judge was The Honorable George M. Marovich of the United States District Court for the Northern District of Illinois.

The *"Certification"* for the verified complaint was given by plaintiff Eugene Dicker-

1. Throughout this opinion, any reference to plaintiffs is a reference to the *Dickerson* interve-　nor-plaintiffs.

son. Under penalty of perjury, he swore as follows:

I, Eugene Dickerson, under penalty of perjury, certify that I have actual knowledge of the facts alleged above and that those facts are true and accurate to the best of my knowledge and belief.[2]

In their *Verified Complaint*, the *Dickerson* plaintiffs alleged, and Mr. Dickerson *via* the above-quoted *Certification* certified, the following:

36. Plaintiffs do not request [that] this court interfere with any of the pending prosecutions but *merely grant prospective relief.*

37. None of the Plaintiffs have been arrested for solicitation or disorderly conduct.

38. On information and belief, unless enjoined Defendant will continue its practice of unlawfully enforcing the ordinances challenged, even though Plaintiffs wish to peaceably engage in lawful activity.

39. Plaintiffs suffer and will continue to suffer irreparable injury in the absence of injunctive relief. *Plaintiffs have no adequate remedy at law.*[3]

Indeed, the *Dickerson* plaintiffs stressed, and Mr. Dickerson, himself, certified that,

*[p]laintiff has no plain, adequate remedy at law* to speedily redress the wrongs complained of other than this [declaratory and injunctive] action. Any other remedy that may exist is not adequate to protect plaintiffs from the threats of defendant and the chilling effect it has upon the exercise of the plaintiffs' constitutional rights.[4]

Accordingly, the *Verified Complaint* did *not* seek damages. And, as the record unequivocally reflects, on *no* occasion before the Court, did the *Dickerson* plaintiffs ever amend their complaint to include a prayer for damages.

The attorney submitting the verified complaint on behalf of *all* of the plaintiffs was Mr. Edward T. Stein.[5] However, it was The Bradley Adam Corporation that "hired the attorney", and paid the fees.[6] There is no evidence in the record that either Mr. Dickerson or Mr. Kleber ever contributed towards Mr. Stein's fee.[7] In any event, in their verified complaint, the *Dickerson* plaintiffs alleged the following.

Plaintiff Eugene Dickerson was the manager of The Bradley Adam Corporation which was a private passport photo and fingerprint service. Plaintiff Matthew Kleber was a clerk and manager trainee of Bradley Adam. Both individuals left the employ of Bradley Adam around the beginning of 1993.[8] Bradley Adam operated its passport photo and fingerprint service at 27 West Jackson Boulevard, Chicago, Illinois. Its services were sought by persons seeking passports, visas, naturalization and other Immigration & Naturalization Service documents.[9] The president and owner of the company was Mr. Avery Ugent.[10]

2. Exhibit 1, *attached to*, "City Of Chicago's Proposed Findings Of Fact And Conclusions Of Law Supporting City's Renewed Motion To Vacate Intervention", which in turn is attached to, "City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention" (hereinafter referred to as "City Exhibit No. 1").

3. Exhibit 1, at 7, "City Of Chicago's Renewed Motion to Vacate The September 30, 1997, Order Granting Intervention" (emphasis added). *See also*, September 17, 1992 Report of Proceedings Before The Honorable George M. Marovich, at 6, wherein *Dickerson* counsel confirms that "[t]he suit here was [for] prospective relief".

4. *Id.*, at 8 (emphasis added).

5. *See*, "Reply To Defendant's Response In Opposition To Plaintiff's Motion To Intervene Or Consolidate", at 10, wherein attorney Stein unequivocally confirms this fact in a written submission before the Court, *to-wit:* "Attorney Edward T.

Stein represents the *BAC* [Bradley Adam Corporation] Plaintiffs."

6. Transcript of the March 17, 2000 proceedings before Judge Manning, at 63, *attached as Exhibit No. 2 to*, "City Of Chicago's Renewed Motion To Vacate The September 30, 1997, Order Granting Intervention".

7. *See*, Transcript of the March 17, 2000 proceedings before Judge Manning, at 26, wherein Mr. Matthew Kleber testified under oath that *"The Bradley Adam Corporation was ... supposed to take care of that [that being payment of Mr. Stein's fees]."*

8. March 17th Tr. 27 and 41.

9. City Exhibit No. 4, at 11.

10. March 17 Tr. 25.

One method of obtaining new business for Bradley Adam was to hire employees to distribute leaflets or handbills to persons on the street in the vicinity of its business. Allegedly, when distributing leaflets, a Bradley Adam employee would often point to the studio, escort the pedestrian to the studio, and along the way describe such details as costs and the time within which passport photographs could be developed. Assertedly, the employees did not interfere with the flow of pedestrian traffic. However, law enforcement investigations disclosed that, to the contrary, persons working for Bradley Adam and its competitor passport photo services were in fact obstructing pedestrian traffic.[11] The investigation was triggered by law enforcement's receipt of multiple complaints from various businesses located in and around the block between State Street and Jackson Boulevard to the effect that the employees of these competing passport photo services were physically blocking store front entrances and preventing pedestrians from entering their respective businesses.[12]

Allegedly, commencing around December 12, 1991, and continuing through to the January 27, 1992 filing date of plaintiffs' verified complaint, Chicago Police personnel descended upon Bradley Adam employees, as well as, the employees of Bradley Adam's competitors and made numerous mass arrests.

On January 22, 1992, Bradley Adam employees were arrested and charged with violations of City Municipal Ordinance 10–8–510 which reads as follows:

*10–8–510. Soliciting business.* It shall be unlawful for any person including the owner of any business adjacent to or near the public way, either in person or through any agent or employee to stand upon, use or occupy the public ways to solicit the trade, custom or patronage for such business, or to interfere with or impede any pedestrian or any one in a vehicle on a public way, for purpose of soliciting business.

Any such soliciting of business on any public way is hereby declared to be a nuisance and the owner or proprietor of any such business who shall refuse or neglect to abate such nuisance after being notified in writing so to do by the superintendent of police, shall be fined not less than $10.00 nor more than $200.00 for each and every day he shall refuse or neglect to abate such nuisance.

Provided, nothing in this section shall be construed to include any business operated wholly or entirely upon any public way under or by virtue of a lawful permit or license issued therefore.[13]

Prior to January 22, 1992, Bradley Adam employees had been threatened with, but not formally charged with violations of Municipal Ordinance 10–8–270, which forbid the distribution of advertising matter in such a way as to litter the public ways or streets.

From December 12, 1991 through January 22, 1992, Bradley Adam employees were arrested for violations of City Municipal Ordinance 10–8–510, and kept in detention at various police facilities for four to six hours at a time. Law enforcement observed the arrestees stepping in front of pedestrians, preventing them from walking, thrusting handbills in front of the faces of pedestrians, and directing pedestrians to a particular place of business.[14] Chicago Police Department arrest reports indicate that each arrest was for orally soliciting business,[15] which is consistent with Ordinance 10–8–510's prohibition of commercial solicitation impeding a public way. However, it is plaintiffs' belief that these "arrests were initiated, not to bring a wrongdoer to justice, but to exercise malice against plaintiffs and to drive the passport studio out of business."[16] The very thrust of the plaintiffs' action "was to stop the City from harassing and arresting [Bradley Adam] employees?7D."[17]

Assertedly, the series of arrests from December 12, 1991 through January 22, 1992

---

**11.**   City Exhibit No. 4, at 11.

**12.**   *Id.*

**13.**   City Exhibit No. 1, at 3 and 4.

**14.**   City Exhibit No. 4, at 13.

**15.**   City Exhibit No. 4, at 13.

**16.**   City Exhibit No. 1, at 6.

**17.**   March 17th Tr. 66.

were part and parcel of a policy and practice of the defendant City of Chicago to harass plaintiffs and their competitors. Plaintiffs asserted, on information and belief, that, unless the City were enjoined prospectively, the Chicago Police Department would continue its practice of enforcing ordinances which plaintiffs maintained were unlawfully vague, overbroad, and unconstitutional on their face and as applied to plaintiffs' business activities.

In their complaint, the *Dickerson* plaintiffs further charged that the City's conduct chilled the plaintiffs' exercise of their First Amendment constitutional rights, and that they had no adequate remedy at law with which to redress the wrongs against them. Specifically, plaintiffs charged that any remedy, other than injunctive relief, simply would not be adequate to protect them from the threat of arrests from the Chicago Police Department, and the chilling effect such threats have upon the exercise of their constitutional rights. In their prayer for right, plaintiffs sought the following:

**A.** [Issuance of] a declaratory judgment that the actions described herein deprived the plaintiffs of rights guaranteed them by the First and Fourteenth Amendments to the United States Constitution.

**B.** [Issuance of] a temporary restraining order, [and thereafter] a preliminary and permanent injunction restraining the defendant, its agents, employees and attorneys, from similar conduct in the future which deprives the plaintiffs of their rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution; and

**C.** Such other relief as this Court deems fit, including costs and attorneys' fees pursuant to 42 U.S.C. § 1988.[18]

The declaratory and injunctive relief quoted above is the only relief sought by the *Dickerson* complaint.

At some point in time in the proceedings, the appropriateness of plaintiffs' request for issuance of a temporary restraining order

against the City was delegated to the then assigned Magistrate Judge for resolution. She viewed the issue as follows:

> The dispute in this case is over the question whether the City of Chicago can prevent commercial establishments, such as U.S. Passport Photo Service, from soliciting business on city sidewalks, through oral communications or through regulation of the size of handbills that a business may hand out to potential customers as they walk on the sidewalks.[19]

An evidentiary hearing on the above noted issue, as well as other issues relating to plaintiffs' request for issuance of a temporary restraining order, was held on January 31st and February 3rd through to the 5th of 1992. In the evidentiary hearing before the then assigned Magistrate Judge, plaintiff Eugene Dickerson testified that he estimated that Bradley Adam lost up to five percent of its sales on days when police made arrests.[20] Notwithstanding Mr. Dickerson's sworn testimony in this regard, the Magistrate Judge found his estimate of a five percent loss per arrested employee unsupported by any "credible" evidence.[21] In any event, since the plaintiffs were free to make this allegation, the Magistrate Judge treated Mr. Dickerson's testimony in this regard as an oral amendment of the pleadings. As so orally amended, the complaint charged that Bradley Adam had sustained a specific loss of business due to the enforcement of Ordinance 10–8–510 against its employees.[22] Even so, the Magistrate Judge instructed the plaintiff to file an amended complaint to this effect at the close of the evidentiary hearing:

> *Plaintiff is instructed, however, to file an amended complaint specifically alleging injury to the corporate plaintiff. If it does not do so, I recommend that the corporate plaintiff be dismissed.*[23]

The Magistrate Judge's ruling in this regard was consistent with prevailing case law. Most courts hold that a general prayer for relief, such as that contained in the *Dicker-*

18. City Exhibit No. 1, at 8 and 9.

19. City Exhibit No. 4, at 1.

20. City Exhibit No. 4, at 4.

21. City Exhibit No. 4, at 19.

22. City Exhibit No. 4, at 6.

23. City Exhibit No. 4, at 5 n. 1 (emphasis added).

*son* complaint, does not include an implicit prayer for damages. Courts will not read a damages claim into a complaint when the complaint only seeks declaratory and injunctive relief. To do otherwise would render the pleading requirements of Rule 8(a)(3) of the *Federal Rules of Civil Procedure* illusory.[24] Plaintiffs never heeded the Magistrate Judge's instruction. No amended complaint specifically alleging monetary injury was ever filed.

In her *"Report and Recommendation"*, the Magistrate Judge ruled that it was doubtful that the plaintiffs would succeed on their constitutionally vague challenge.[25] She ruled further that although the plaintiffs had argued that the City was discriminatorily enforcing Ordinance 10–8–510 against them and other passport photo services, no evidence supporting this charge was introduced at the evidentiary hearing on their request for issuance of a temporary restraining order.[26] She ruled further that the plaintiffs had "shown little likelihood of succeeding on the merits." [27] Indeed, she found that "[m]uch of the evidence presented at the hearing concerned deceptive business practices by the passport photo services",[28] including "misleading advertisements" regarding photograph and fingerprint fees.[29]

Because the plaintiffs had failed to show that the ordinances at issue were "likely to be facially invalid for vagueness", because they had failed to show "that the ordinances [were] likely to be invalid as applied to their [business activities and] conduct", and because the evidence suggested that the public interest would be harmed should a temporary restraining order issue against the defendant City, the Magistrate Judge recommended that the District Judge not grant the plaintiffs such extraordinary injunctive relief.[30]

At the time of the District Judge's consideration of the Magistrate Judge's *Report and Recommendation*, an appeal of an order of the Circuit Court of Cook County dismissing various quasi-criminal complaints under Section 10–8–510 was pending before the Illinois Appellate Court. On September 17, 1992, the City appeared before the then assigned District Judge to present a motion to compel the plaintiff, Bradley Adam Corporation, to answer discovery. The state court appellate proceedings were discussed by the parties in open-court before the then assigned District Judge:

> *Mr. Stein*: The City has said to a colleague of mine that they are not—and the City has by their actions not made any more arrests. If that is the case, I am perfectly willing to have this case—the case is moot. *This case [Case No. 92 C 665] is moot.* If that's the position of the City, that they are not going to make any more arrests, *then this case is moot.*
>
> *Court*: You [the City] want to go forward on the arrests? Is that what you guys are doing?
>
> *City*: We are going forward on the arrests.
>
> *Court*: I am dismissing this matter as moot.[31]

By Minute Order dated September 17, 1992, the then assigned District Judge dismissed the complaint and terminated the action:

> The complaint [1–1] and counterclaim [22–2] are hereby dismissed as moot. Terminating case.[32]

The action was dismissed as moot.

Plaintiffs had no objection to the dismissal on mootness grounds. Plaintiffs believed the

---

**24.** *See, e.g., Thomas R.W. v. Massachusetts Department of Education*, 130 F.3d 477, 480 (1st Cir.1997); and *Seven Words LLC v. Network Solutions*, 2001 WL 902149, at *8 (9th Cir. August 13, 2001). *See generally, James Luterbach Construction Co., Inc. v. Adamkus*, 781 F.2d 599, 602 (7th Cir.1986).

**25.** City Exhibit No. 4, at 9.

**26.** *Id.*, at 10.

**27.** *Id.*, at 10 and 23.

**28.** City Exhibit No. 4, at 16.

**29.** *Id.*, at 18 n. 5, and 22.

**30.** City Exhibit No. 4, at 24, 25, and 26.

**31.** September 17, 1992 *Report of Proceedings Before The Honorable George M. Marovich*, at 6 (emphasis added).

**32.** Docket Entry No. 56.

case to be moot, because the City was no longer arresting any Bradley Adam employees:

In fact, to plaintiffs' knowledge, there hasn't been an arrest under this section [§ 10–8–510], anywhere in the city, since August 13, 1992. *What mooted this case [Case No. 92 C 665] is the City's decision not to make any more arrests.* This decision was clearly made by the police department and not by present counsel.[33]

Continuing in this vein, *Dickerson* counsel stressed the following:

Since there have been no arrests, no suits against the corporation or threats of suits ... *the case is moot.*[34]

Clearly, *Dickerson* counsel, himself, viewed the case as seeking solely injunctive relief. Clearly, he viewed the need for injunctive relief to have abated. Most conclusively, he clearly did not view the action as having a component of compensatory damages.

On October 8, 1992, the City filed a motion asking the District Judge to reconsider his dismissal. More specifically, the City's *"Motion To Reconsider The Court's Order Of September 17, 1992"* "request[ed] that th[e] Court reconsider its order of September 17 and vacate the order dismissing th[e] case as moot." [35] *The Dickerson plaintiffs opposed the motion.* As noted earlier, it was their *then* held perspective that their *injunctive* action was moot because the City was no longer arresting any Bradley Adam employees. No need for injunctive relief—no need for the action to pend. Compensatory damages were not in their mind-set. Accordingly, consistent with his *then* held perspective of the case, *Dickerson* counsel vehemently opposed the City's motion to reinstate the action, calling the motion "misleading, slanderous and inaccurate." [36] Notwithstanding plaintiffs' vigorous opposition, by *Minute Or-*

*der* dated October 15, 1992, the District Judge reinstated the action, ruling as follows:

Defendant's motion [57–1], order cause reinstated. All proceedings are stayed pending rulings by the State Appellate Court in related proceedings. Parties are to promptly advise this Court when a ruling is made. Case reopened. Case stayed as to all proceedings.[37]

Thereafter, by *Minute Order* November 1, 1994, the District Judge, *sua sponte,* again dismissed plaintiffs' action:

Cause dismissed without prejudice and with leave to reinstate, if need be, after resolution of the State Appellate Court proceeding. Terminating case.[38]

On November 23, 1994, the Illinois Appellate Court issued its ruling.[39]

Thereafter, one year and six months later, on May 28, 1996, the *Dickerson* plaintiffs filed before the dismissing District Judge a motion to reinstate their federal action, contending that the constitutional issues at the heart of their complaint remained unresolved by the rulings of the Illinois Appellate Court.[40] The *"Motion To Reinstate"* was filed on behalf of all of the plaintiffs by the "Law Offices of Edward T. Stein". The District Judge denied the motion to reinstate, ruling as follows:

This Court denies Plaintiffs' motion for two reasons.

*First,* and foremost, reinstatement of this action is not necessary for consideration of Plaintiffs' constitutional claims. On August 26, 1993, Eric Aikens, Torrence Jamerson and other individuals prosecuted under Section 10–8–510, by their attorney, Edward T. Stein (who is also Plaintiffs' attorney in this action), filed case no. 93 C 5233, asserting various claims for false and unlawful arrest. Specifically, *Aikens et al.*

---

33. *"Plaintiffs' Response To Defendant's Motion To Reconsider Court's Order Of September 17, 1992 "*, at 3 (emphasis added).

34. *"Plaintiffs' Response To Defendant's Motion To Reconsider Court's Order Of September 17, 1992 "*, at 4 (emphasis added).

35. *"Motion To Reconsider The Court's Order Of September 17, 1992,"* at 4.

36. *Id.*

37. Exhibit 5, at 12, *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997, Order Granting Intervention."*

38. Exhibit 5, at 12.

39. Docket Entry No. 70, *attached as Exhibit C to, "Plaintiffs' Opposition To Defendant City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention "*.

40. Docket Entry No. 70, at 2.

alleged that their arrests were without probable cause because, among other things, Section 10–8–510 is unconstitutional. This action is currently pending before Judge [Manning]. Thus, any and all issues pertaining to the constitutionality of Section 10–8–510 are likely to be considered and resolved absent reinstatement of the present action. Judicial efficiency requires that this Court refrain from creating the possibility of duplicative litigation and/or inconsistent results by denying Plaintiffs' motion; the Court will not permit Plaintiffs to create a "second front" in their war against the City.

**Second,** Plaintiffs waited over a year and a half after the Illinois Appellate Court's decision and almost a full year after the denial of the City's motion for rehearing to file the present motion. Plaintiffs cannot, and do not, offer any explanation for their dilatory action. Rather than countenance such delay and risk prejudicing the City, the Court denies Plaintiffs' motion to reinstate; *Plaintiffs may seek to intervene in the action before Judge [Manning].*[41]

Thereafter, on or around July 16, 1996, plaintiffs filed a *"Motion To Reconsider"*. In their motion to reconsider, the *Dickerson* plaintiffs noted that the case of *Aikens v. City of Chicago,* Case No. 93 C 5233, 2001 WL 1083436, then pending before The Honorable Blanche M. Manning, would only partially resolve the issues asserted in their complaint:

> *Aikens* addresses the rights of the arrestees. [Plaintiffs'] case addresses the rights of the employers of the arrestees. As a practical matter the damages are different and not overlapping. The Defendants in *Aikens* have argued in part that even if the City did not properly notify the employers, the leaflets [distributed] violated ordinances not charged. The *Bradley Adam Corporation* case presents a purer issue involving the ordinances.[42]

The motion was filed on behalf of all of the plaintiffs by the "Law Offices of Edward T. Stein". By *Minute Order* dated July 16, 1996, the District Judge entered and continued plaintiffs' motion to reconsider until ruling from the *Aikens* court on plaintiffs' motion to intervene.[43] Later, by *Minute Order* dated March 10, 1997, the District Judge denied plaintiffs' motion to reconsider, *without prejudice,* to their filing a renewed motion if it became appropriate to do so.[44]

On or around October 1, 1996, the *Dickerson* plaintiffs filed a *"Motion To Intervene Or Consolidate"* before the then *Aikens* District Judge, The Honorable Blanche M. Manning of the United States District Court for the Northern District of Illinois.[45] The motion to intervene or consolidate was filed on behalf of all of the *Dickerson* plaintiffs by the "Law Offices of Edward T. Stein". Artfully or inartfully, the motion omitted citing the rule or statute pursuant to which it was filed. Because no statute of the United States conferred upon the *Dickerson* plaintiffs an unconditional right to intervene in the *Aikens* action, we presume that the motion was filed pursuant to Rule 24(a) or Rule 24(b) of the *Federal Rules of Civil Procedure,* or both.

Rule 24(c) of the *Federal Rules of Civil Procedure* dictates the procedures to follow when filing a motion to intervene. Among the procedures to follow is the following:

> The motion [to intervene] shall state the grounds therefor and *shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought.*[46]

Contrary to the instruction of Rule 24(c), no complaint or amended complaint accompanied the motion to intervene. Nor did the motion reference and seek to incorporate thereby the complaint already of record in Case No. 92 C 665. Whether such a "loose" reference and incorporation would have satisfied the spirit and letter of Rule 24(c), we

---

41. Docket Entry No. 70, at 2 (emphasis added). *Aikens* originally pended before The Honorable James B. Zagel of the United States District Court for the Northern District of Illinois. Upon her appointment to the bench, the case was reassigned to The Honorable Blanche M. Manning.

42. Docket Entry No. 71, at 1.

43. Docket Entry No. 72.

44. Docket Entry No. 74.

45. City Exhibit No. 6.

46. Rule 24(c), 28 U.S.C.A. (emphasis added).

need not decide. We need only focus on the *undisputed facts*, and they are as follows:

1. The then assigned Magistrate Judge specifically instructed the *Dickerson* plaintiffs to file an amended complaint. They did not do so.

2. Rule 24(c) of the *Federal Rules of Civil Procedure* instructs persons seeking to intervene in an action to accompany their motion with "*a pleading setting forth the claim or defense for which intervention is sought.*" Plaintiffs did not follow the rule. No such pleading accompanied their motion to intervene.

In their motion to intervene, plaintiffs state that their action of *Dickerson and others v. City of Chicago,* Case No. 92 C 665, was filed on behalf of the owners and managers, of some of the passport photo studios, in large part to enjoin the enforcement of the ordinances involved in the *Aikens* class action.[47] Continuing, the *Dickerson* plaintiffs stated that,

[t]he injunctive relief component of the *Dickerson* case [was] moot. What remains, in Plaintiffs' view, is whether and to what extent the owners are entitled to damages for the Defendant's illegal policy, practice or custom. This is almost identical to the substantive issue left open in *Aikens.*[48]

The motion closed by advising Judge Manning that substantial justice would "be done if [she] allow[ed] the *Dickerson* plaintiffs to intervene and consolidate [their] case with *Aikens* ".[49]

As noted earlier, although the *Dickerson* plaintiffs' motion to intervene spoke of entitlement to monetary damages, no amended complaint to that effect had ever been filed in their case. Nor did they seek leave of court to file *instanter,* with their motion to intervene, an amended complaint to that effect.

By *Order* dated September 30, 1997, Judge Manning granted the *Dickerson* plaintiffs' motion to intervene. To the extent that the *Dickerson* motion sought consolidation, it was denied, *without prejudice.* In granting the *Dickerson* motion to intervene, the District Judge, aware of the motion's omission of a complaint, took judicial notice of the court file for *Dickerson v. Chicago,* Case No. 92 C 665, including the complaint contained therein.[50]

The District Judge believed that intervention was appropriate because resolution of the *Aikens*' Fourth Amendment challenge might require the District Judge to determine whether Ordinance 10–8–510 was invalid for being unconstitutionally vague and overbroad as asserted by the *Dickerson* plaintiffs. The Judge reasoned that the *Dickerson* plaintiffs' interests would be impaired if the Ordinance was found to be constitutional:

As both actions [*to-wit: Aikens* and *Dickerson* ] arise in the same court, and involve the same novel issue of the construction and constitutionality of the Ordinance, a finding that the Ordinance does not violate the constitution would be likely to have persuasive *stare decisis* effect on any efforts by the *Dickerson* plaintiffs to challenge past or future enforcement of the Ordinance.[51]

Accordingly, the Judge concluded that "the outcome of [the *Aikens* ] action may impede or impair the *Dickerson* plaintiffs' claims",[52] and, thus, intervention was appropriate.

The *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention* " essentially rests on two grounds, *to-wit:* "(1) intervention was improperly granted based on false pretenses, and (2) there is no valid settlement to prevent vacating the improper intervention."[53] Because we find the motion meritorious for other reasons, we will not discuss in great detail the City's charges of fraudulent conduct by opposing counsel.

47. Docket Entry No. 64, at 2.

48. Docket Entry No. 64, at 2.

49. *Id.,* at 3.

50. Docket Entry No. 79, at 3 n. 3.

51. Docket Entry No. 79, at 8.

52. *Id.,* at 9.

53. *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Ordering Granting Intervention* ", at 2.

We review the **undisputed** facts. Irrespective of what they now assert, the *Dickerson* plaintiffs only filed an action for declaratory and injunctive relief. They did not seek compensatory damages. Indeed, they expressly stated in their *Verified Complaint* that they had no adequate remedy at law.

At the January 31st, and February 3rd through the 5th, 1992 evidentiary hearing on the *Dickerson* plaintiffs' request for issuance of a temporary restraining order, the then assigned Magistrate Judge expressly instructed the plaintiffs "to file an amended complaint specifically alleging injury to the corporate plaintiff." She ruled further that "[i]f it d[id] not do so, [she would] recommend that the corporate plaintiff be dismissed." [54] Plaintiffs never complied with her instruction. And, eventually, for whatever reason, their case was twice dismissed. After the second dismissal, *the action was never reinstated*.

▮ Judge Manning granted the *Dickerson* plaintiffs' motion to intervene. Recognizing their failure to comply with Rule 24(c) of the *Federal Rules of Civil Procedure,* which required the plaintiffs to accompany their motion to intervene with a pleading setting forth the claim for which intervention was sought, the District Judge endeavored to save the plaintiffs from themselves by taking judicial notice of their original complaint filed in their original action, *to-wit:* Case No. 92 C 665. Whether to permit a procedurally defective motion to intervene was within the sound discretion of the District Judge.[55] However, generally speaking, compliance with the procedural requirements of Rule 24(c) may not be achieved simply by adopting the prior pleadings of a party,[56] even if the prior pleading was one's own. Intervenors may not totally ignore the requirements of the Rule.[57] Total dereliction of the Rule warrants dismissal of the motion to intervene.[58] In any event, we need not decide whether the District Judge's perspective of the requirements of Rule 24(c) was correct or not. The fact remains that the District Judge could only take judicial notice of the complaint on file. And that complaint was solely for declaratory and injunctive relief. As noted earlier, the *Dickerson* plaintiffs' complaint did not seek compensatory damages, nor was it ever intended to:

> *City*: Mr. Ugent, [Mr. Avery Ugent is the owner of lead plaintiff, The Bradley Adam Corporation], the document I have in front of me purports to be an attorney's contract [with attorney Stein] for injunctive relief. Do you recall signing that, Sir?
>
> *Mr. Ugent*: Yes, I do.
>
> *City*: ... And you retained Mr. Stein to file a lawsuit for an injunction and for declaratory relief against the City of Chicago, is that correct?
>
> *Mr. Ugent*: That's correct.
>
> *City*: Do you know what injunctive relief is, Sir?
>
> *Mr. Ugent*: Injunctive relief is like to put an injunction on the City to stop having their police arrest and harass the employees of my corporation. That's what I understand it to be.
>
> *City*: **And this was a lawsuit just for injunctive relief and not for money damages, is that correct, Sir?**
>
> *Mr. Ugent: That's correct.*[59]

The intent of the three plaintiffs is further reflected in the *"Attorney Contracts (Injunctive)"*, which each of them executed on January 24th, 1992. Each of the plaintiffs executed a retainer agreement containing the following quoted language:

### ATTORNEY'S CONTRACT (INJUNCTIVE)

*January 24, 1992*

I/We hereby retain and employ Edward T. Stein, attorney at law, to prosecute or set-

**54.** City Exhibit 4, at 5 n. 1.

**55.** *Retired Chicago Police Assoc. v. City of Chicago,* 7 F.3d 584, 595 (7th Cir.1993).

**56.** *Retired Chicago Police Assoc.,* 7 F.3d, at 595.

**57.** *Shevlin v. Schewe,* 809 F.2d 447, 450 (7th Cir.1987).

**58.** *Federal Trade Com'n. v. Med Resorts International, Inc.,* 199 F.R.D. 601, 606 (N.D.Ill.2001).

**59.** City Exhibit No. 2, at 62 (63, 64 and 65) (emphasis added).

tle all claims and suits for injunctive or declaratory relief against City of Chicago or others who may be liable on account of violations to my statutory or constitutional rights.

I understand that fees for services rendered and to be rendered are as follows: as per oral agreement with Avery "Jack" Ugent, President, The Bradley Adam Corp.[60]

Thus, Case No. 92 C 665 was unequivocally intended to be *and was* an action solely for declaratory and injunctive relief.

By their own words, "[t]he injunctive relief component of the *Dickerson* case [was] moot." [61] The *Dickerson* plaintiffs' motion to intervene was concerned with "whether and to what extent the *owners* are entitled to damages for the Defendant's illegal policy, practice or custom." [62] However, as demonstrated above, the *only* components of the *Dickerson* plaintiffs' *Verified Complaint* was a request for declaratory relief and a request for injunctive relief. There was no prayer for damages. *Therefore, there was no claim for damages of which judicial notice could be taken.*

Having already been dismissed, Case No. 92 C 665 was not a viable action in any event at the time of the filing of the motion to intervene. Further, no claim for damages could be resurrected from a complaint void of a prayer for damages. Accordingly, we must agree with the City of Chicago, the grant of intervention was improper.

In closing, we comment briefly on whether or not there was ever a settlement reached in this case. *There was not.*

At a settlement conference, the subsequently assigned Magistrate Judge persuaded the City to settle the *Dickerson* action for $50,000. The offer was not accepted by the plaintiffs. Indeed, it was rejected. This fact is buttressed by the lead plaintiff's own sworn testimony:

> *City*: And it was your understanding that as a result of the settlement The Bradley Adam Corporation would be receiving $50,000, is that correct?
>
> *Mr. Ugent*: I recall about the $50,000. I remember telling him [Mr. Stein] to try to get more, like around 75. I remember telling him that.
>
> *City*: But you said that The Bradley Adam Corporation would take $50,000, is that right, Sir?
>
> *Mr. Ugent*: Did I say that then?
>
> *City*: Yes.
>
> *Mr. Ugent*: **The first time he brought it to me attention? No, I didn't.**[63]

The Court's understanding of the scenario of events is further buttressed by the September 21, 1998 letter of attorney Stein to City counsel, Mr. Jeffrey N. Given, *to-wit:*

> Dear Mr. Given:
>
> I have had a chance to communicate with Mr. Ugent since our settlement conference.
>
> **He has told me to reject your offer.** He has authorized me to make a $75,000 demand. In the interests of settling the matter, I told Mr. Ugent I would reduce my fees for any amount over $50,000.
>
> Please let me know what you want to do as soon as possible.[64]

Thus, it is undisputed that Mr. Ugent had rejected the first offer of $50,000, and had countered with $75,000, which, in turn, the City rejected.[65] If the parties renegotiated the settlement on their own, the Court is unaware of it.

It appears from the record that the settlement offer was subsequently reinstated by the City.[66] However, subsequent conduct and

---

60. City Group Exhibit No. 3.

61. City Exhibit No. 6, at 2.

62. *Id.* (emphasis added). It must be remembered that Messrs. Dickerson and Kleber were not owners.

63. City Exhibit No. 2, at 73 and 74 (emphasis added).

64. Exhibit B, *"Plaintiff's Response To The City Of Chicago's Motion To Vacate"* (emphasis added).

65. *See also,* the November 13, 1998 letter from City counsel to Mr. Stein setting forth the City's concerns with certain admissions made by Mr. Stein in a November 5, 1998 telephone voice mail message to City counsel, *attached as Exhibit D to, "City Of Chicago's Motion To Vacate Order Granting Intervention".*

66. *See, "Affidavit Of Jeffrey N. Given",* attached as Exhibit No. 10 to, *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention".*

statements of Mr. Stein foreclosed *forever* the possibility of a settlement being reached.

As noted in this opinion, Mr. Stein repeatedly referred to himself as the attorney for all of the plaintiffs. This meant that he represented the interests of each and every one of the plaintiffs, and that all of the plaintiffs would take a portion of the settlement proceeds. Yet in a November 5, 1998 recorded voice mail message for City attorney, Mr. Jeffrey N. Given, Mr. Stein created concerns for the City over the legitimacy of Messrs. Dickerson and Kleber as plaintiffs, and the ethical appropriateness of his *past, present, and continued* representation of all three of the plaintiffs:

> *Mr. Stein*: Jeff [City attorney Jeffrey N. Given], this is Ted Stein. It's 2:25. I'm calling on the *BAC [Bradley Adam Corporation]* case. I've talked to Jack, laid out basically your line, and he's basically said okay, let's do it.
>
> So I'm going to call Judge Rosemond's chambers to say that we've accepted the $50,000, and we don't need to appear in court nor to have any phone conversation. Hopefully you'll get this message today.
>
> * * * * *
>
> There is another—in talking with Jack—you know, when I originally filed the lawsuit, I put individuals, including Bradley Adam Corporation, down as ... plaintiffs, and it escapes me why—you know, there was—I think some of the individuals were hassled by the police, blah, blah, blah. But—or—I'm not even sure why. They might have—you know, I can't even speculate.
>
> In any event, Jack and the guy—Dickerson have gone, have parted rancorously, and Dickerson was just a manager and had no—has—really has no claim here. I haven't heard from him in years. And, in fact, he was—I think he fired me as

his lawyer, never to reretain me. So we don't—nothing should be in this guy Dickerson's name. He doesn't have any, any claim. And so I just want to make a—you soon.[67]

"Jack" is the nickname for Mr. Avery Ugent, president and owner of The Bradley Adam Corporation.[68] At the outset, it must be noted that Mr. Stein "jumped the proverbial gun". He did in fact telephone the chambers of the assigned Magistrate Judge and informed them that the case had settled. The Magistrate Judge, in turn, issued a *Minute Order* to that effect, and terminated the Referral. However, Mr. Stein was in error.[69] To the contrary, his voice mail message did not finalize settlement of the case, it blew it apart. In any event, the bottom line is that instead of finalizing the settlement negotiations, the above-quoted voice mail message broke them off *forever*.

For one thing, Mr. Stein's voice mail message was *not* an acceptance of the City's settlement offer. It was a counter-offer. Prior to his voice mail message, the City presumably was prepared to issue three checks for a total of $50,000. Mr. Stein put a new "wrinkle" into the settlement terms by instructing the City to issue only one check to only one plaintiff, and to ignore the remaining plaintiffs. This eleventh hour instruction was a modification—a material change in terms—a counter-offer—which the City was free to accept or reject:

> A settlement agreement is a contract, and construction and enforcement of settlement agreements are governed by principles of contract law. For a contract to exist, there must be an offer and acceptance, and to create a binding contract, the acceptance must comply strictly with the terms of the offer.[70] An acceptance requesting modification or containing terms that vary from those offered constitutes a rejection of the original offer and becomes

**67.** Exhibit 11, *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention."*

**68.** *See,* City Group Exhibit No. 3.

**69.** The error was corrected by the Magistrate Judge by *Minute Order* dated November 16, 1998

(Docket Entry No. 96). On that date the case was reinstated.

**70.** *Hills of Palos Condominium Assoc., Inc. v. I-Del, Inc.,* 255 Ill.App.3d 448, 476, 626 N.E.2d 1311, 1331, 193 Ill.Dec. 760, 780 (1st Dist.1993).

a counter-proposal that must be accepted by the original offeror before a valid contract is formed. Similarly, when one accepts an offer conditionally or introduces a new term into the acceptance, no acceptance occurs; rather, there is a counter-proposal requiring acceptance by the offeror before a valid contract is formed.[71]

The City rejected the counter-offer.

The above-quoted admission by Mr. Stein that he no longer represented all of the plaintiffs, and that that circumstance may well have existed for some time, further tore asunder any hope of settlement. The admission created a plethora of problems and conflict of interests issues for the City. For example, who was Mr. Stein representing? If he no longer represented Mr. Dickerson, why wasn't Dickerson given the opportunity to obtain other counsel? How could Mr. Stein protect the interests of one plaintiff to the detriment of the remaining plaintiffs? And, what was the "story" with Mr. Kleber? Mr. Stein's voice mail message opened a Pandora's box of complications and a host of credibility, good faith, *res judicata,* and litigation finality issues which the City rightfully declined to deal with:

> Mr. Stein's counter offer—when he admitted that he did not have authority to negotiate a full and complete settlement for all claims for all plaintiffs because he had not represented all the plaintiffs in this case for years—does not even come close to a meeting of the minds required for a settlement agreement.[72]

The City had every right to expect that Mr. Stein would engage them on a level playing field. That meant that he had three plaintiffs ready, able, and willing to accept their settlement offer. He was unable to deliver:

> It is the City of Chicago's position that because you apparently did not (and do not) have the authority to negotiate and accept Magistrate Rosemond's $50,000.00

compromise settlement on behalf of *all plaintiffs* to the *Dickerson* case, *there is no settlement.* Further, the basis upon which it was reached gives the City reason to question the validity of the compromise offer itself, as well as several other aspects of the litigation.[73]

An inherent key term of the City's settlement offer was that it be a *full and final settlement* of *all* claims in the lawsuit. The City fully expected that their settlement offer would be accepted by all three intervenor-plaintiffs, and that it would receive Releases from each. Stein changed the rules of the game at the last minute. He was prepared to accept the offer on behalf of *only one* of the plaintiffs, and only one Release would be given. The City was not required to accept the change of rules.[74]

In addition to raising a multitude of ethical concerns which rightfully sounded the death knell for the proposed settlement, the above-quoted voice mail message raised questions concerning the legitimacy of Messrs. Dickerson's and Kleber's status as plaintiffs. Indeed, it raised the specter of Messrs. Dickerson and Kleber being nothing more than bogus plaintiffs. Mr. Stein's above-quoted voice mail message, as well as the record in its entirety, strongly suggests that more likely than not the inclusion of Messrs. Dickerson and Kleber as plaintiffs in Case No. 92 C 665 was solely for litigation strategy purposes.

Are Messrs. Dickerson and Kleber valid plaintiffs or not? If not, then having them listed in the caption of the case as aggrieved parties is misleading to the Court, the defendant, and the public at large. Who is to say whether or not it was misleading to Judge Manning? Who is to say whether or not it influenced or had any impact on her decision to grant intervention. In any event, the legitimacy of the individuals' status as plaintiffs having been called into question, the

---

**71.** *Loeb v. Gray,* 131 Ill.App.3d 793, 799 and 800, 475 N.E.2d 1342, 1346 and 1347, 86 Ill.Dec. 775, 779 and 780 (5th Dist.1985).

**72.** April 7, 1999 letter from City counsel to Mr. Stein, *attached as Exhibit D to, "Plaintiff's Response To The City Of Chicago's Motion To Vacate".*

**73.** December 23, 1998 letter by City counsel to Mr. Stein, *attached as Exhibit E to, "City Of Chicago's Motion To Vacate Order Granting Intervention"* (emphasis added).

**74.** *See, Hills of Palos,* 255 Ill.App.3d, at 477, 626 N.E.2d, at 1331, 193 Ill.Dec., at 780.

City was not required to culminate a settlement, which now due to Mr. Stein's voice mail message, was shrouded in doubt, suspicion, and confusion. Rightfully and appropriately, the City elected not to settle and, instead, filed the *instant "Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention."* Accordingly, no settlement was, reached by the parties. Consequently, no settlement prevents our grant of the City's motion.

It is true that some time after the City had rejected his counter-offer, Mr. Stein retracted from his position articulated on the November 5th voice mail message, and produced all three plaintiffs—ready, able, and willing to accept the original offer of the City. It is undisputed that the three intervenor-plaintiffs were willing to settle their claims for $50,000 in May of 1999. However, in May of 1999, the City's offer to settle had long since been withdrawn. There was nothing for them to accept. It is equally undisputed that they did not agree to settle in November of 1998. Indeed, it is undisputed, as reflected by his November 5th voice mail message, that in November of 1998, *Dickerson* counsel was never ready, willing, and able to deliver Releases to the City of Chicago for all three intervening plaintiffs. By his own words, he only intended to do so for one, *to-wit:* The Bradley Adam Corporation. Since he was only prepared to settle for one of the plaintiffs, it goes without saying that he had no express authority from Messrs. Dickerson and Kleber to settle at the $50,000 figure. And, indeed, the record bears this out. Even assuming for the sake of argument only, that *Dickerson* counsel had an implied authority to settle for all three plaintiffs in May of 1998, it is besides the point, *because he never offered to do so.*

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. The *"City Of Chicago's Renewed Motion To Vacate The September 30, 1997 Order Granting Intervention"* is hereby granted. Said intervention is hereby dismissed *with prejudice.* Any damages claims which the *Dickerson* plaintiffs might seek to assert are now clearly barred by the applicable statute of limitations.[75]

2. The September 30, 1997 Order [Docket Entry No. 79] granting the *Dickerson "Plaintiffs' Motion To Intervene Or Consolidate"* [Docket Entry No. 64] is hereby vacated.

3. The September 17, 1996 *Dickerson "Plaintiffs' Motion To Intervene Or Consolidate"* [Docket Entry No. 64] is hereby denied.

4. The prior grant of intervention was improper because at the time of the filing of the *Dickerson* plaintiffs' motion to intervene their action, bearing Case No. 92 C 665, was no longer a viable case.

5. The prior grant of intervention was improper because at the time of the filing of the *Dickerson* plaintiffs' motion to intervene their action, bearing Case No. 92 C 665, was moot, by their own admission, and it contained no prayer for damages to form a predicate for continuation of the action.

6. The prior grant of intervention was improper because of the failure of the *Dickerson* plaintiffs to comply with the procedural requirements of Rule 24(c) of the *Federal Rules of Civil Procedure.*

7. The record shows that no settlement was reached, because at the eleventh hour, *Dickerson* counsel made a material modification to the *then* understood premise of the settlement reached by the parties, which modification was rejected by the City.

8. The record shows that no settlement was reached because the City's concerns regarding the status and legitimacy of Messrs. Dickerson and Kleber was never satisfactorily resolved.

9. The parties never reached a settlement. Therefore, there is no settlement on record which would preclude the grant of the *"City Of Chicago's Renewed Motion To Va-*

---

75. The statute of limitations applied to claims brought in Illinois pursuant to 42 U.S.C. § 1983 is the two year statute of limitations for personal injury actions. *See, Ashafa v. City of Chicago,* 146 F.3d 459, 461 (7th Cir.1998).

*cate The September 30, 1997 Order Granting Intervention ".*

**So Ordered.**